## EQUITABLE LOAN AND SECURITY COMPANY *v.*
## LEWMAN, and *vice versa.*

1. A second new trial should not be granted where the presiding judge approves the finding of the jury upon the issue of fact, unless some error of law has been committed.

2. The true owner of land, by attesting a deed the contents of which he knows, made by a person who has no title, will be estopped from asserting his title as against the grantee and his privies. This estoppel will not bind an existing creditor of the person estopped. Where such creditor subsequently reduces his debt to judgment, the lien thereof is superior to the equity of a third person who has neither title nor lien from the true owner, notwithstanding such owner is estopped from asserting his title because of having witnessed a deed to such third person made by one without title to the premises therein described.

3. The purchaser at an execution sale is subrogated to all the rights of the execution creditor bringing about the sale; and before his title thus acquired can be defeated by an equity in a third person, the purchaser must not only have actual notice of the equity, but that equity must be superior to the lien of the judgment creditor bringing about the sale.

4. That one claiming ownership of a tract of land upon which another asserts a lien may have agreed with the latter, or with some one else, to pay off his claim of indebtedness affords no reason for holding that the claimant of the land is estopped from setting up title thereto. If the agreement be made with the person asserting a lien, his remedy is upon the contract; if made with some other person, then the lienholder is a mere stranger to it, and is not in a position either to enforce the contract or to urge it by way of estoppel.

5. Although the court may, in charging the jury, make use of a purely technical expression which correctly presents the law governing the case on trial, yet this is not cause for a new trial when there is no reason to apprehend that the jury failed to grasp the meaning of the expression so used, and the complaining party made no request of the court to elucidate the instruction excepted to.

6. Since the passage of the recording act of 1889 (Civil Code, § 2778), an unrecorded deed made by a testatrix is ordinarily to be regarded as inferior in dignity to a deed, duly recorded, subsequently made by her devisee to an innocent purchaser for value without notice of the prior conveyance. But this statute has no application to a case where the testatrix recognized in her will the title of her donee, and the purchaser from her devisee was thus put upon notice that the property conveyed to him formed no part of the estate of the testatrix and could not be regarded as passing to the devisee under the residuary clause of the will.

Argued June 24,—Decided November 13, 1905.

Levy and claim. Before Judge Lumpkin. Fulton superior court. October 19, 1904.

On December 18, 1865, Timothy Burke conveyed by deed to Mrs.

Maria L. Harris a lot in the City of Atlanta, 100 by 275 feet, having a frontage of 100 feet on the east side of what was then known as Collins street. She entered into possession and for years occupied a house erected on the north half of this lot. Subsequently, in 1878 or 1879, her son-in-law, R. M. Farrar, built a house on the south half of the lot, with money which he borrowed for that purpose, and he and his family lived there continuously from that time up to 1886. Mrs. Harris died on December 6, 1884, leaving a will which contained the following provisions: To two of her daughters, Josephine E. and Matilda F. Harris, she devised the house and lot which she had occupied as a home, the premises being described as No. 179 Collins street, having a frontage on that street of 50 feet and running back 275 feet, bounded on the north by the house and lot of Mrs. C. P. Sams, and on the "south by house and lot of Robt. M. Farrar." The executor was directed to collect the proceeds of a policy of insurance on the life of Mrs. Harris, and divide the same among certain named beneficiaries, one of whom was her daughter, Frances F. Farrar, the wife of R. M. Farrar. The residue of the estate, both real and personal property, was given to Josephine E. and Matilda F. Harris, share and share alike. The testatrix nominated as her executor Robt. M. Farrar, and, after her death, he qualified as such and procured her will to be probated at the January term, 1885, of the court of ordinary of Fulton county. On March 4, 1896, Matilda F. Harris executed her will; she died shortly thereafter, and Robt. M. Farrar, who was nominated as executor, brought the will to probate at the August term, 1897, of the court of ordinary. The sole beneficiaries under this will were Josephine E. Harris and Frances F. Farrar, to whom was devised the half interest of the testatrix in the house and lot occupied by Mrs. Harris prior to her death, situated on Courtland (formerly Collins) street, and described in the will as being the same lot which was willed to testatrix by her mother. At the date of the death of Mrs. Harris her sole heirs at law were the three daughters above mentioned. On April 2, 1898, the survivors of them, Josephine E. Harris and Frances F. Farrar, executed quitclaim deeds inter se, therein describing the premises purchased by their mother from Timothy Burke in 1865, and reciting that they each acquired an undivided half interest in the property by inheritance from their mother, being her sole heirs at law; that her estate had never been administered,

there being no necessity for an administration, as she owed no debts; and that having inherited their respective interests in her estate free from encumbrance, and being her sole heirs at law and of lawful age, they had agreed between themselves upon a division of the property. The deed from Mrs. Farrar to Miss Harris purported to convey an undivided one-fourth interest in the north half of the lot, which was described as having 100 feet frontage on Courtland street; and the deed to Mrs. Farrar recited that the grantor conveyed an undivided one-half interest in the south half of that lot, and that in the division Mrs. Farrar reserved an undivided one-fourth interest in the north half. One of the subscribing witnesses to these deeds was Robt. M. Farrar. On April 9, 1898, Mrs. Farrar procured a loan of $1,000 from H. L. Lewman, and executed and delivered to him a security deed purporting to convey to him a three-fourths interest in the south half of the lot last above mentioned. Her husband also witnessed this deed. It was filed for record on April 30, 1898, and was duly recorded. On April 18, 1898, a fi. fa. in favor of D. W. Rountree and against R. M. Farrar and others issued from the city court of Atlanta. Mrs. Farrar died within a year or so afterwards, and Walter Tomlinson was appointed administrator upon her estate. As such he sold to the Equitable Loan & Security Co. an undivided three-fourths interest in the entire tract which had been purchased by Mrs. Harris in 1865, and on the 22d of December, 1900, executed and delivered to that company a deed, in which the property was described as having a frontage of 100 feet on Courtland avenue. It immediately went into possession of the premises under this deed and one from Josephine E. Harris whereby she undertook to convey an undivided one-fourth interest therein. In the latter part of that year, Miss Harris, who had been living with Farrar as a member of his family, went to Texas. Before leaving, she turned over to him a bundle of papers which she said she had been keeping since the death of her sister, Matilda, who had taken charge of her mother's papers upon her decease. Some months later, Farrar discovered among these papers one which appeared to be a deed to him, executed on the 27th of June, 1878, by Maria L. Harris, Josephine E. Harris, and Matilda F. Harris, and attested by two witnesses. It recited a consideration of $2,000 and purported to convey a four-fifths undivided interest in the city lot hereinbefore referred to as the south half of the tract

purchased dy Mrs. Harris, the lot being that on which Farrar had built the house in which he lived from sometime in 1878 or 1879 up to 1886. The deed was in the handwriting of Farrar. Indorsed thereon, also in the handwriting of Farrar, was the following affidavit, subscribed to by one of the attesting witnesses, E. M. M. Hooper, before William W. Grant, a notary public, on August 3, 1878: "State of Georgia, Fulton County. Personally appeared before me, the undersigned, a Notary Public in and for said State and County, E. M. M. Hooper, who, being duly sworn, on oath says that the said Maria L. Harris, Josephine E. Harris, and Matilda F. Harris signed, sealed, and delivered the within deed in his presence and in the presence of the other witness, L. J. Farrar." Shortly afterwards, Robt. M. Farrar showed this deed to C. J. Simmons, an attorney, who he thought was representing the administrator of the estate of Mrs. Farrar. Simmons subsequently caused two fi. fas. against Farrar, of which he was the transferee, to be levied on the south half of the lot on Courtland street, and .the Equitable Loan & Security Co. interposed its claim to the land. The company effected a settlement with Simmons, and afterwards, under an agreement with the holder of the fi. fa. in favor of Rountree against Farrar et al., permitted the southern portion of the lot to be sold at sheriff's sale as the property of Farrar, itself becoming the. purchaser at the sale under. this fi. fa. Before the sale, a representative of the company announced that it had bought the property from the administrator of Mrs. Farrar. An attorney who represented Lewman also gave the following notice to prospective bidders: "Notice is hereby given that the property about to be sold as the property of R. M. Farrar, situated on Courtland street in the City of Atlanta, is not the property of R. M. Farrar, but that the same was owned by Mrs. Fannie F. Farrar, who executed a loan deed upon the same to H. L. Lewman for the principal sum of $1,000, which indebtedness has been reduced to judgment, together with the interest and cost, and that said judgment is a superior lien to any title that can be passed under a sale of that property as the property of R. M. Farrar, and that any person who buys said property as the property of R. M. Farrar gets a bad title." This sale took place on the first Tuesday in August, 1902, and on the 5th of that month the sheriff made a deed to the property to the Equitable Loan & Security Co. Subsequently Lewman caused the

same land to be levied on as the property of the estate of Mrs. Farrar, under the judgment obtained against her administrator. The Equitable Loan & Security Co. interposed a claim; and at the trial of the issue thus formed Lewman sought to resist its claim by setting up the following facts as an estoppel upon it to assert title to the property: Robert M. Farrar assisted in procuring to be executed the deed from Josephine E. Harris to Fannie F. Farrar, conveying a half interest in the property in controversy to Mrs. Farrar, and also assisted in procuring to be executed the deed from his wife to Josephine E. Harris, conveying an interest in the adjoining lot. He knew these deeds were made for the purpose of dividing the estate of Maria L. Harris, and also that they were for the purpose of inducing Lewman to make a loan of $1,000 to Mrs. Farrar. He witnessed the deed from Mrs. Farrar to Lewman, and knew the purpose for which that deed was executed, and used the money loaned to his wife for the support of his family. This loan was made before the judgment in favor of Rountree and against Farrar was rendered, and the latter was estopped to claim title as against Mrs. Farrar or her grantee under the deed executed by Maria L. Harris in 1878, and, at the time the judgment against him was rendered, he had no interest in the property upon which the lien of that judgment could attach. Moreover the claimant undertook and agreed to pay the indebtedness of Mrs. Farrar to Lewman, by a writing in the possession of claimant, dated December 26, 1900, and, on account of the assumption of this indebtedness and the claimant's agreement to pay the same, the claimant can not now dispute either the amount thereof or its priority over any title the claimant may have.

The court declined to allow Lewman to interpose this plea of equitable estoppel against the claimant, and the case was submitted to the jury upon the issue whether or not Mrs. Harris had ever delivered to Farrar the instrument in the form of a deed purporting to have been executed by her and her two daughters, Josephine and Matilda Harris, on the 27th of June, 1878. Upon this issue, the jury found in favor of the Equitable Loan & Security Co., the claimant. Lewman thereupon made a motion for a new trial, upon divers grounds, all save one of which the court overruled. The Equitable Loan & Security Co. excepts to the granting of a new trial on the ground of the motion which the court sustained; and

Lewman, by a cross-bill of exceptions, complains of the overruling of the other grounds of his motion, and also of the refusal of the court to allow his plea of equitable estoppel.

*Candler & Thomson* and *W. D. Thomson,* for Equitable Loan and Security Company.

*DuBignon & Alston* and *Howard Van Epps,* contra.

EVANS, J. (After stating the facts.) 1. This not being the first grant of a new trial, and the presiding judge having expressed himself as satisfied with the finding of the jury upon the only issue submitted to them for their determination, their verdict should be allowed to stand if sufficiently supported by the evidence, unless the plaintiff in fi. fa., Lewman, was unjustly prevented from presenting his contention that the Equitable Loan & Security Co. was estopped from asserting title to the land levied on. There was, we think, ample evidence to sustain the conclusion that the deed from Mrs. Harris to Farrar, in the execution of which two of her daughters joined, was delivered to him in 1878. He testified on the trial that he could recollect nothing with regard to its execution and delivery to him, and would not have assisted his wife in procuring a loan on the land as her property in 1898 had he at that time known of its existence, and that he did not remember ever having seen the paper till, some months after he received the bundle of papers which Miss Josephine E. Harris stated had belonged to her mother, he discovered it among them. Miss Harris testified she had no remembrance of signing it and could not identify as genuine the signature of herself or sister, though what purported to be the signature of her mother corresponded with her handwriting. On the other hand, there was testimony, which Farrar did not undertake to question, that the paper was drawn up in his handwriting, as was also the affidavit of one of the subscribing witnesses. This witness was sworn at the trial, and testified that the document was genuine and he had signed the probate indorsed thereon before W. W. Grant, a notary public, at the West Point freight-depot, in the City of Atlanta. The notary public was shown to be no longer in life. The tax returns showed that Mrs. Harris did not, after the year 1878, return this south half of the land for taxes, but that the same was returned in the name of R. M. Farrar as owner from 1879 up to 1898. He stated he had, with money borrowed for the

purpose, erected on the lot the house in which he lived up to 1886, but gave no satisfactory account of the circumstances under which he assumed to take possession of the premises, further than to say he had to live somewhere, and that he occupied the house without objection from Mrs. Harris. In her will, Mrs. Harris recognized this lot as belonging to Farrar, by describing the premises she devised to her daughters as being bounded on the "south by house and lot of Robt. M. Farrar." The deed was never recorded prior to the commencement of this litigation, but there was testimony from which the jury could infer that it was designedly kept from record because Farrar was financially embarrassed and did not wish the fact of his ownership of the lot to become known to his creditors. In view of all the circumstances brought to light, we are of the opinion that the finding of the jury should not be disturbed; and in our further discussion of the case the fact will be assumed that in 1878 Mrs. Harris did execute and deliver to Farrar a deed covering an undivided four-fifths interest in the land in controversy.

2, 3. The true owner of property may estop himself by his conduct from asserting title to his own property, as when he stands by and allows property belonging to him to be sold to an innocent purchaser for value as the property of another. *American Mortgage Co.* v. *Walker,* 119 *Ga.* 341, and cit. Or, he may so estop himself by attesting a deed, of the contents of which he knows, made by a person who has no title. *Ga. Pac. Ry. Co.* v. *Strickland,* 80 *Ga.* 776. The negotiation of the loan from Lewman by Farrar in behalf of his wife and his attestation of her deed given to secure the loan would estop Farrar from asserting title in his own favor as against Lewman, assuming, of course, Lewman's ignorance of the true title. This estoppel in pais occurred pending the suit, but before the rendition of the judgment under which the land was sold. While the doctrine of caveat emptor applies to sheriff's sales, a bona fide purchaser at an execution sale, who has paid the purchase-money without notice of an equity, will be protected against the same. *Johnson* v. *Equitable Co.,* 114 *Ga.* 604. The purchaser is subrogated to all the rights of the execution creditor bringing about the sale; and before the title of a bona fide purchaser can be defeated by an equity in a third person, the purchaser must not only have actual notice of the equity, but that equity must be superior to the lien of the judgment creditor bringing about the sale.

*Atkinson* v. *Beall,* 33 *Ga.* 153; *Humphrey* v. *Copeland,* 54 *Ga.* 543.
"It is the right of the judgment *creditor* to sell whatever his judg-
ment binds. This right would be impaired if *purchasers* were not
allowed a corresponding right to buy. This corresponding right to
buy purchasers would not have if they were liable to be affected by
a notice of other liens or claims inferior to the judgment." *Smith*
v. *Jordan,* 25 *Ga.* 689. From these observations it will appear that
no proper solution of the rights of the purchaser at sheriff's sale
can be arrived at without determining the relative superiority of
the lien of the Rountree execution, which sold the land, and the
lien of Lewman acquired by virtue of Mrs. Farrar's security deed,
aided by the estoppel of Farrar. While great stress was laid, in
the argument, upon the fact that the estoppel occurred a few days
before the judgment was entered, we do not think this circumstance
at all conclusive. The suit of Rountree which eventuated in the
judgment was pending at the time the Lewman loan was effected.
This particular creditor of Farrar had a right to reduce his debt
to judgment, and the lien of his judgment ought not to be re-
stricted because his judgment debtor had defrauded some one else.
The general rule of estoppel is that only parties and their privies to
the act or representation relied on to estop are affected by an es-
toppel in pais. 11 Am. & Eng. Enc. L. (2d ed.) 439. It can
hardly be contended that any privity could exist between two
creditors of a common debtor, each contending for priority of lien
and preference in payment of his debt, where neither conspired with
the debtor to defraud the other. In Shearer *v.* Woodburn, 10 Pa.
St. 511, the Supreme Court of Pennsylvania held that "declarations
by one reputed to be the owner of lands that the title was in A,
made to one who thereafter purchased A's title, will not estop a
subsequent purchaser under a judgment recovered against such
person, at or about the time of his making such declarations, from
setting up his title against the purchaser from A." A similar rul-
ing was made in Lyon *v.* Morgan, 64 Hun, 111, by the Supreme
Court of New York. Bigelow, in his work on Estoppel (5th ed.),
609, says "it would seem that a purchaser of goods is not a privy
in estate or otherwise with his vendor so as to be affected by an
estoppel in pais resting on the vendor in respect of the goods.
Thus, if a person stand by and allow his goods to be sold as the
goods of another to one who does not take possession, and the actual

owner afterwards sell the same to another person for value and without notice of the previous transaction, the latter would be entitled to the goods against the first purchaser. The owner would simply be precluded from setting up title against the purchaser. It is not the office of an estoppel to *pass* title. The title remains, but it can not be asserted against the party who acted upon the false representation. With reference to others it may be asserted or conveyed; and a purchaser, not being a privy, would not be estopped to assert title to the goods. This is certainly true of a purchaser under an execution against the real owner." The author cites Richards *v.* Johnston, 4 Hurl. & N. 660, in support of this last proposition. In that case it was said that "A sheriff who comes to seize the goods of a debtor under a writ of execution is not bound by an estoppel which might have prevented the debtor himself from claiming the goods." In a later English case, that of Richards *v.* Jenkins, 18 Q. B. Div. 456, 56 L. J. Q. B. 293, Lord Esher said: "Such an estoppel merely prevents the party who is estopped from saying as against some other party that the goods do not belong to such other party, though in fact they do not belong to him; and it only takes effect as between parties and privies. If the execution creditor could for this purpose be said to claim through and under the execution debtor so as to be in privity with him, he might be estopped. But I do not think he can be said to so claim; he claims through and by the law as against the execution debtor and not through and under him." In a Nebraska case it appeared that the owner of a business, by representing that it belonged to his wife, induced persons to sell goods to her and to take a mortgage as security. Other persons, who had no knowledge of this misrepresentation, sold goods to the husband, and afterwards issued attachments against him. The court held that the attaching creditors were not bound by the estoppel, and consequently took priority over the mortgage. Oberfelder *v.* Kavanaugh, 29 Neb. 428. See also Bingham *v.* Kirkland, 34 N. J. Eq. 229. In Water's Appeal, 35 Pa. St. 526, Woodward, J., said: "The truth is, the relation of judgment creditors to their debtor's real estate is anomalous. They have a lien upon it by virtue of statute law, but they have no interest in it such as makes them privies in estate with their debtor." A contrary view was expressed in Parker *v.* Crittenden, 37 Conn. 148, in which case it was held that attaching creditors of a debtor,

who with intent to defraud his creditors had conveyed a hack to another and then stood by and allowed him to sell to an innocent purchaser, were privies in estate with their debtor, and, as such, estopped to set up title in him. This was ruled notwithstanding it appeared that the innocent purchaser had not paid for the property, the court saying he "had a right to the benefit of his purchase." In Ewart on Estoppel, 208 et seq., the author, in commenting on these two lines of decisions, which differ as to whether an estoppel upon a debtor will bind his creditors, says (p. 210) : "Solution of the question in hand by a discussion of the existence of privity does not appear to promise great success." He expresses the opinion that if privity in estate be the test, a purchaser at sheriff's sale gets only that which the debtor had, subject to all equities of every sort; but suggests (p. 209) that the true test to be applied, in determining whether or not a party other than the one who has estopped himself by his conduct can assert title in any given instance, is to "ascertain upon general principles who ought to have priority, and then, in accordance with the conclusion so arrived at, declare that the sheriff's purchaser was, or was not, in privity with the vendor, and so bound by the estoppel." This seems to be the proper test, looking to the origin and the purpose of the doctrine of equitable estoppel and its application to a case where the owner of property stands by and allows it to be purchased as the property of another. Those only who are chargeable with the fraud, actual or constructive, perpetrated upon the innocent purchaser, and those who seek to gain some benefit or advantage therefrom or, as volunteers, succeed to the rights of the person who has estopped himself by his conduct, should be held bound by the estoppel. Creditors gain nothing by the commission of such a fraud upon an innocent purchaser, but (if held bound by the estoppel upon their debtor) must suffer the loss of their demands against him, in whole or in part. They do not seek to ratify or confirm any act which he has done with respect to his property, but repudiate an act which was fraudulent, not only as against the innocent purchaser, but as against them as well; for by that act the debtor disclaims title to property which ought to go towards paying off his just debts, instead of being sold for the benefit of a person who has no title or interest in it nor lien upon the same. Certainly, as a general rule, "No privity exists between creditor and debtor; there is neither devolution nor

subordination of rights in the relation." Bigelow on Estoppel (5th ed.), 343. As between creditors of a common debtor, one is not entitled to prevail over another unless he has acquired a superior lien such as is recognized by law in the way which the law prescribes. Thus, in Water's Appeal, supra, an owner of land conveyed it to another with general warranty, acknowledging receipt of payment of the purchase-price and taking judgment for a portion of the purchase-money which had not in point of fact been paid. Subsequently, other creditors of the vendee obtained judgments against him, which were levied on the land, and the proceeds of the sale were paid into court. These creditors then sought to exclude the vendor from participation in the distribution, because of the recitals in his deed to their debtor; but the court held there was no estoppel of which they could take advantage. So it will be seen that the rule of estoppel, based upon the theory of privity in estate, works both ways, and can not be relied on as bringing about equitable results, as was recognized in the case just cited. "Estoppel arising in virtue of a misrepresentation is the converse of an action of deceit. The property or interest claimed by reason of the estoppel corresponds to the damages sought in the action of deceit; and in order to make good the claim of estoppel, the same things, it should seem, are requisite that are necessary to the maintenance of the action mentioned." Bigelow on Estoppel (5th ed.), 609-610. The wrong committed upon an innocent purchaser from one other than the true owner, who stands by and allows a fraud to be committed upon the party misled, gives to him a cause of action. As against the true owner, he has two remedies: one an action for damages for the deceit practiced upon him, and the other a plea of equitable estoppel against asserting title to the property so bought. If the former remedy were pursued, no one could contend that, by reason of the purchase under such circumstances, the purchaser acquired any estate or interest in the property, or lien thereon. Only by proving his cause of action and procuring judgment upon his demand against the true owner could the purchaser obtain any lien upon the property, and the judgment lien would rank in dignity, as against other liens on the property, only in the order of its date. He would not, until he in this way established a lien, stand in any better position, relatively to other judgment creditors of the owner, than any one who had a demand against

him not reduced to judgment. The law gives priority, among creditors, to those who first avail themselves of the remedies whereby they can establish and enforce their rights against the common debtor. The innocent purchaser who is the victim of the fraud can not, by way of equitable estoppel, gain an advantage over others having claims against the owner of the property, since he has no lien thereon nor legal nor equitable estate therein. He is simply the victim of a tort, and has no greater interest in the property of the tortfeasor than would a person who was injured by its owner's carelessness or wilfulness in running over him in the street with a carriage or automobile.

As we have endeavored to show, the purchaser of the land under the Rountree fi. fa. is remitted to all the rights of the plaintiff in fi. fa.; and as the record suggests nothing even tending to estop the original execution plaintiff, it is immaterial what notice may have been given on the day of the sale, or what was the arrangement between the purchaser and the transferee of the execution looking to the bringing of the land to sale. The purchaser's title was altogether unaffected by the estoppel of Farrar, and if the legal title was in Farrar at the date of the judgment under which the sale was made, then it passed by virtue of the sale to the purchaser. The finding of the jury that the deed from the Harrises to Farrar had been delivered settled the issue of fact as to title.

4. It was further urged in the amendment offered, and which was disallowed, that the claimant undertook and agreed to pay the indebtedness to the plaintiff in writing, and that, on account of this assumption of the indebtedness and agreement to pay the same, the claimant can not now dispute either the amount thereof or the priority of the same over any title it may have. It does not appear from the allegations of the equitable amendment with whom the claimant entered into this agreement. If the agreement was made with the plaintiff in fi. fa., his remedy is upon the contract; if made with some other person, he is a mere stranger to it and it can not be urged as an estoppel against the claimant in asserting its title to the premises.

5. Criticism is made on the instruction of the court on the subject of delivery of a deed, the plaintiff insisting that one of the phrases used by the court was technical and should have been explained to the jury. The court instructed the jury that delivery

was sufficient if the deed went out of the hands or control of the grantor, "with her intent that it [should] operate and inure as a muniment of title to the grantee." This expression is characterized as so technical that its meaning should have been explained to the jury. Considered in connection with the context, we can not think that an intelligent jury could have failed to apprehend the meaning of the court. Besides, if the plaintiff had desired any further elucidation of the instruction, he should have made a timely request of the court. *Holmes* v. *Clisby,* 121 *Ga.* 248. In these modern times, where there is such a general diffusion of education among the masses and our juries are made up of intelligent and upright citizens, it would seem that they should be given some credit for intelligence and comprehension, even though the idea be expressed in other than colloquial speech.

6. In the third, fourth, and fifth grounds of the motion for a new trial complaint is made that the court submitted to the jury the single issue whether or not the deed from Mrs. Maria L. Harris, Josephine E., and Matilda F. Harris to Robert M. Farrar had ever been delivered; and failed to instruct the jury that inasmuch as this deed was not recorded, it was junior to the deed held by Lewman from Frances F. Farrar, for the reason that the title held by her and conveyed to Lewman was derived through the will of her mother and her sister, Matilda, and by a deed from Josephine E. Harris, which was duly recorded—provided Frances F. Farrar took this deed from Josephine E. Harris without notice of the prior conveyance made to Robert M. Farrar. Prior to the recording act of 1889 (Civil Code, §2778), a recorded deed from an heir or devisee was inferior in dignity to an unrecorded deed of the ancestor. *Webb* v. *Wilcher,* 33 *Ga.* 565; *McCandless* v. *Inland Acid Co.,* 108 *Ga.* 618. This rule was changed by the act of 1889, and that statute applies where the senior deed was made by a testatrix and the junior by her devisee. *Holder* v. *American Investment Co.,* 94 *Ga.* 641. But the court properly omitted to submit to the jury any issue as to the relative priority of the unrecorded deed to Robert M. Farrar, for the reason that under the undisputed facts the junior deeds relied on by Lewman should not have been given priority, inasmuch as the record of the title of Frances F. Farrar to the lot in controversy was sufficient to put Lewman on notice that Mrs. Maria L. Harris had, prior to the

execution of her will, disposed of this lot to Robert M. Farrar, and
that it therefore constituted no part of the residuum of her estate.
It will be remembered that in the will of Maria L. Harris the lot
on Collins street, which was specifically devised to two of her
daughters, was described as being bounded on the "south by house
and lot of Robt. M. Farrar," who was then in possession of the
premises. This lot is the one now in controversy. In the will of
Matilda F. Harris she undertook to devise only her half interest in
the house and lot which had been occupied by Mrs. Maria L. Harris
prior to her death, and reference was made to her will for a more
particular description of this lot. An investigation of Mrs. Far-
rar's claim of title would have disclosed to Lewman that she got
no estate by inheritance from her mother, but derived such title
as she had under the will of her mother and the subsequent will
of her sister, Matilda. The recitals to the contrary in the deed
from Josephine E. Harris to Mrs. Farrar were untrue, as an ex-
amination of the records by Lewman at the time of making the
loan to Mrs. Farrar would have demonstrated. The records dis-
closed, not only that Mrs. Harris died testate, but that in her will
she recognized that the house and lot forming the southern bound-
ary of her home place and then being occupied by Farrar belonged
to him and formed no part of her estate. In view of this un-
equivocal disclaimer of ownership on the part of Mrs. Harris, no
one would be warranted in assuming that the lot in controversy
passed under her will as a part of the residuum of her estate.
Lewman thus had constructive notice that Mrs. Harris recognized
the title to this lot to be in Robert M. Farrar, and therefore is not
in a position to assert that he stands in the attitude of an innocent
purchaser without notice of the unrecorded deed from her to
Farrar.

The foregoing discussion disposes of all the questions presented
with which it is necessary to deal. The court below very fully and
fairly submitted to the jury the only issue which was really in-
volved in the controversy, and their finding upon this issue should,
we think, be allowed to stand.

*Judgment on main bill of exceptions reversed; on cross-bill
affirmed. All the Justices concur, except Lumpkin, J., disquali-
fied, and Beck, J., not presiding.*