CHENOWETH-HOLDER LUMBER CO. v. BECK & JONES.

*Wright, Wright & Covington,* for plaintiff in error.

*H. L. Lanham, Harris & Harris,* and *Lamar Camp,* contra.

ATKINSON, J.   Beck & Jones, a partnership, and others brought their equitable petition against Chenoweth-Holder Lumber Co. (hereinafter called the Chenoweth Company) and the Leeper Realty Company.   In the suit the petitioners sought to have established and declared the priority of their lien as contractors, mechanics, laborers, and materialmen, as against the security deed executed by the Leeper Realty Company to the Chenoweth Company.   It appears that on August 18, 1928, the Leeper Realty Company, which was then the owner of a number of lots in Floyd County, Georgia, known as Northwood Heights, entered into a contract with Beck & Jones, by which the latter were to construct ten houses for them on lots in this subdivision.   At the time Beck & Jones began the construction of four of these houses the Chenoweth Company held a security deed to lots 14 and 16, upon which the houses were being constructed.   When the houses on lots 14 and 16 were completed, the Leeper Realty Company applied for a loan thereon, and Chenoweth Company canceled its security deed, and Beck & Jones canceled their claim of lien against these premises.   It is contended by the Chenoweth Company that, in the presence of Beck & Jones and with their full knowledge, a security deed was executed by the Leeper Realty Company to the Chenoweth Company on October 27, 1928, conveying lot No. 41, the lot in controversy, the house on this lot being partially constructed.   By agreement of all parties a receiver was appointed, and he sold the property, the proceeds being held in lieu of the property, subject to the final disposition thereof by the court.   At the trial the entire case was submitted to the court without the intervention of a jury; and after hearing evidence the court awarded to Beck & Jones the sum

of $543.39 from the proceeds of the sale in the hands of the receiver. The Chenoweth Company filed its motion for a new trial, which was overruled, and the Chenoweth Company excepted.

■ After a consideration of the record and the questions involved which are insisted upon, this court is of the opinion that the finding and holding of the court below was authorized under the evidence in the case. The lien of Beck & Jones was duly recorded, and was prior in date to the security deed executed by the Leeper Realty Company to the Chenoweth Company. The Chenoweth Company insisted that when it took this security deed it held title to lots 14 and 16; that it surrendered and released its title to these lots in order to enable Leeper to put through a loan on the two lots; that Beck & Jones knew that by this deed the Leeper Realty Company was conveying lot 41, upon which they claim a lien, to the Chenoweth Company to secure the payment of the amount stated in the deed; and that having this knowledge they are, under the facts in the case, estopped from asserting their lien as against the security deed. It appears that Beck was one of the witnesses to the security deed, and that he was present when it was executed; and it is contended by the Chenoweth Company that Beck & Jones had knowledge of the transaction that took place on October 27, 1928, that led up to the execution of the deed. Bruce Chenoweth, general manager of the Chenoweth Company, testified in part as follows: "At the time of this transaction, on October 27, 1928, I held title to lots 14 and 16. It was after some of the work was started. I released those lots on October 27th, in order to enable Leeper to put through a loan on those lots. . . When I took this warranty deed to secure debt on lot 41, it was for a present consideration. He already owed me the money, and I let him have $1400 back at that time instead of taking it over. I let him have $1400 October 27th, it wasn't actual cash at that time. He owed me $2800, and he paid the $1400 that day. . . When I took this deed I did not know that Beck & Jones and Dempsey had money due them by Leeper Realty Co. for work done by them. From the talk that Beck & Jones had at Mr. Wright's office I presumed that was all cleaned up. I thought the house was complete. I wasn't paying any attention. . . I believe the Jones house was coming along. I thought this house was clear, or I would have got my money right then. I knew Beck & Jones had the con-

tract. I didn't know Dempsey had the contract for the plastering. Beck & Jones were present in the office when this warranty deed was executed. I think Mr. Beck was there. I recall Mr. Jones was there. I thought the house was completed on 41 and the indebtedness paid. I understood that this was completed and the lot was clear and the lot was released; so I thought I was in the same position by taking that as I had been in the other. I thought that just from the general conversation. Mr. Beck was present the whole time. . . I know that Beck and Jones were working up there, and I knew that Dempsey was. I thought that they were paid. Beck came in at the time the money was advanced. The money was advanced with the understanding that it was going to him. I furnished it to Leeper Realty Company while Beck was there. I talked over matters with Beck in Mr. Wright's office. There was $2800 coming, and Leeper wanted the $1400 so that he could use the $1400 instead of giving it to me to pay off. I was talking with Beck, and Beck gave me the understanding that he was acquainted with it. Beck was not a lawyer, but I supposed he knew the details." Chenoweth testified that Jones also was present during the transaction; and this was not denied by Jones. The security deed from Leeper Realty Company to the Chenoweth Company, dated October 27, 1928, was introduced in evidence, and E. W. Beck was an attesting witness to this deed.

The testimony of E. W. Beck as to this transaction was in part as follows: "At the time I started this work I did not know that Chenoweth-Holder Lumber Company held deed to other lots out there. I first learned that after the work was completed; must have been along in February before I knew of them having a deed to this particular piece of property. . . This is my signature to the paper you present me [the deed in question], as a witness. That wasn't my understanding of that deed. I knew that the title on the other two houses was in Leeper Realty Company, and that the deeds were made by Leeper Realty Company to Stephens and some other party on those two lots, and at that time Beck & Jones waived their claims against those two lots. That is my recollection. I don't think we received any money on that date [of execution of deed]. We may have done it anyhow, released the other lots. . . We received $250 on October 27, 1928. I do not know that I recall this transaction at your office. We had so

many, I don't know whether I could recall that particular one or not. I recall that Chenoweth-Holder was releasing these other properties that they held, in order to enable a loan to be negotiated. The loan was just to pay Chenoweth. Mr. Chenoweth paid the $250 to me. . . I am not a party to this deed in any way, only as a witness. I know nothing of the transaction at all. We signed a stack of papers about that high, and that was all there was to that. . . I talked with Mr. Chenoweth several times about the amount of money due us by the Leeper Realty Company on these houses. He knew that before October 27, 1928, when this mortgage deed was executed; all of the time. I think he knew about as much about this transaction as I did. . . I do not know how much that I released. I did not keep it separate. I had a general contract. There were four houses built. I released my claim against the other three entirely. . . I do not have any idea how much was due us on October 27, 1928. Four hundred and five dollars was due me on the first two houses. The work was going on on the other houses at the same time. This work covered all the labor and work done in the two houses. . . Mr. Leeper admitted that he was due us $1,112.74. There was no dispute as to the amount."

T. E. Leeper, president of the Leeper Realty Company, testified in part as follows: "When I executed this deed to Chenoweth-Holder Lumber Company, I stated to Mr. Chenoweth about how much I owed Beck & Jones and to Elliott and Dempsey, and he knew what the contract was. I gave him an estimate of how much it was, how much balance was due on it. . . At the time this deed was taken, the Chenoweth-Holder Company held a security deed for twenty-eight hundred dollars, or two security deeds for fourteen hundred dollars each, on lots 14 and 16 in Northwood Heights. One of these was deeded over to Stephens, and one over to Mr. Beck. Mr. Stephens procured a loan on his, and Mr. Beck procured a loan on his. When those loans were ready to be closed, Mr. Stephens, Mr. Beck, Mr. Jones, and myself met with Mr. Graham Wright in his office, together with a representative of the loan company. At that time Mr. Beck gave a release on lots 14 and 16. At that time there was not quite enough to have paid the entire $2800 coming to Mr. Chenoweth; there were commissions and expenses to come out. On that date we paid Mr. Chenoweth $1400

in one check, which was Mr. Chenoweth's, and $884.44 in another. That was material and money furnished. The three houses had been run together. And then we gave him a security deed for $1400 for the difference, and $844.44 in cash. I have not got the figures as to how much I paid Mr. Beck that day. Mr. Beck had drawn money on the three jobs along each week, and then the security deeds were made to Chenoweth-Holder Company on 14 and 16, and settlement made with Beck & Jones. On that date there was due Beck & Jones $205.77 on lot 16, $172.09 on lot 41, $261.63 on lot 5. . . At the time this security deed was made and this loan of $1400 was put on the property, Mr. Beck was present and witnessed the deed made to Chenoweth-Holder Co. . . The houses were to be built on the lots that I might have designated from time to time. Each of these houses was an independent job, and so carried on our books. The total amount that was paid for material that went into house on lot 41 was $1176.61 to Beck & Jones and Chenoweth-Holder Company. The extras would run the job to $1620. There was $371.30 and $172.09 still due Beck & Jones. Beck & Jones, without regard to Elliott, Dempsey, Bradfield, and Walker, are only due a balance of $172.09. $172.09 would be due Beck & Jones if this job was completed and all the bills paid; that is, if these bills be eliminated. That would make total due them of $543.39 on lot 41."

We have thus quoted extensively from the material testimony of witnesses for each of the parties. It is true that the evidence as to the amount due Beck & Jones under their lien on lot 41 is somewhat vague and confusing. Nevertheless we can not hold that the court, to whom the whole case was submitted, would be unable to determine that the amount found and allowed was actually due under the lien.

■ The fact that Beck & Jones were present during the transaction would not necessarily estop them from asserting their lien. In the transactions which were carried on in the room where these parties were assembled on October 27, 1928, the court might find that neither Beck nor Jones had knowledge of the security deed executed by the Leeper Realty Company to the Chenoweth Company. It is true that Beck signed this deed as a witness, and a presumption arises that he knew the contents thereof; but he denies that he knew the contents of the deed. And this evidence might

well have been taken as true by the court. We know that men do frequently attest deeds as witnesses without knowing the contents of the deeds; and Beck distinctly testified: "I am not a party to this deed in any way, only as a witness. I know nothing of the transaction at all. I signed a stack of papers about that high, and that was all there was to that." The court was authorized to find that this was a denial that Beck knew the contents of the deed, although he signed it as a witness. And if he did sign as a witness without knowing the contents of it, and held a lien upon the lot conveyed by the deed, of which the grantee in the deed had knowledge, then he did not estop himself or his partnership from asserting his lien. Of course, if the other partner, Jones, had knowledge of the transaction, and was present, and knew that the deed conveyed lot 41 to the Chenoweth Company, and said nothing of the lien of his partnership on that lot, then Beck & Jones would be estopped. But the court was authorized to find that neither member of the firm of Beck & Jones knew the contents of the deed. In *American Freehold Land Mortgage Co.* v. *Walker,* 119 *Ga.* 341 (46 S. E. 426), it was said: "Even where one attests a deed, there is a presumption that he knows of its contents; and unless this presumption is removed, he is estopped from asserting, against the grantee therein, an interest based on any right then outstanding in himself. *Butt* v. *Maddox,* 7 *Ga.* 504 (4); *Ga. Pac. Ry. Co.* v. *Strickland,* 80 *Ga.* 776 [6 S. E. 27]; *Fleming* v. *Ray,* 86 *Ga.* 533 [12 S. E. 944]." And in *Equitable Loan Co.* v. *Lewman,* 124 *Ga.* 190 (52 S. E. 599, 3 L. R. A. (N. S.) 879), it was said: "The true owner of land, by attesting a deed the contents of which he knows, made by a person who has no title, will be estopped from asserting his title as against the grantee and his privies." But in this case the court could find, as we have said above, that Beck & Jones did not know the contents nor the purport of the deed which Beck attested as a witness, though there was strong evidence to indicate that one or both of them did have knowledge of the contents. This, however, was a question for the court; and if he found in favor of the contentions of Beck & Jones, as he was authorized to do under the evidence, then he was authorized to make the finding and render the judgment excepted to.

*Judgment affirmed. All the Justices concur.*