## BANK OF LENOX *v.* WEBB NAVAL STORES COMPANY.

No. 7797.   November 14, 1930.

*Wilcox, Connell & Wilcox,* for plaintiff.

*Smith & Ferguson* and *H. W. Nelson,* for defendant.

HINES, J.   On November 10, 1926, J. M. Crumpton conveyed to the Bank of Lenox two described tracts of land, to secure a debt.   This deed was made subject to a prior security deed executed by a former owner of these lands to the Penn Mutual Life Insurance Company.   On November 25, 1929, the insurance company sold these lands at public outcry under the power of sale contained in its security deed; and at said sale the bank, to protect its interest therein, purchased these lands and took a deed thereto. On January 12, 1929, Crumpton executed to Webb Naval Stores Company, a firm composed of E. L. and G. G. Webb, two leases to the pine timber on these lands suitable for turpentine purposes. This firm under its leases began to work the timber.   Thereupon the bank filed its petition in which it alleged that these lessees were working the timber without lawful title, warrant, or authority, and were trespassers; and sought to enjoin them from so working. In reply to this contention of the bank, the defendants alleged that Crumpton had proposed to convey to them the pine timber on these lands suitable for turpentine purposes; but, being aware

of the above two security deeds on these lands, they were unwilling to lease such timber without the consent of the bank. They advised J. D. Robinson, the president of the bank, that Crumpton had proposed to lease to them the right to work the pine timber on these lands for turpentine purposes for a period of years, and they inquired of Robinson whether the bank would agree to such lease from Crumpton to them. They stated to Robinson that they would not lease from Crumpton this timber for turpentine purposes, or pay him any amount thereon, without the consent and approval of the bank. Thereupon Robinson, acting for the bank, stated to them that the bank had agreed to advance and would be required to advance money to Crumpton for the purpose of enabling him to carry on his farming operations on these lands in 1929; but if the defendants should lease from Crumpton the timber on these lands, this would relieve the bank from making such advances to Crumpton, and that it would in every respect be satisfactory and agreeable to the bank for Crumpton to lease the pine timber on these lands to the defendants for the purpose aforesaid. After receiving this information from the bank, the above two leases were prepared and executed. G. G. Webb and Crumpton presented these leases to Robinson, acting for the plaintiff, and again inquired of him if the bank agreed to the sale of the timber on these lands to defendants for turpentine purposes. At that time no money had been paid by the defendants to Crumpton. In response to this second inquiry of the defendants, Robinson again stated that it was entirely satisfactory to the bank for Crumpton to convey such timber to the defendants, that the bank would guarantee to them that they would be able to work the timber as provided in the leases, and that if it became necessary the bank would take up the indebtedness to the insurance company, or, in the event the insurance company sold these lands under the power of sale in its security deed for the purpose of collecting its indebtedness against the same, the bank would buy these lands and protect these defendants in the rights which they acquired under the leases executed by Crumpton to them. As a result of this agreement Crumpton delivered the two leases to defendants in the presence of Robinson, and then and there the defendants paid on said leases to Robinson, the president of the bank, the sum of $100, which Robinson then delivered to Crumpton.

In rebuttal of this claim of the defendants, the bank denied that there was any agreement between it and Crumpton, whereby it was to furnish to Crumpton money and supplies with which to carry on his farming operations on these lands for the year 1929; that Robinson, as its president, had agreed for Crumpton to convey the timber on these lands to the defendants for turpentine purposes; that the defendants had delivered to the bank $100 as part of the purchase-price of the turpentine privileges under said leases; that Robinson had then delivered the same to Crumpton; that the defendants had paid to it or to its president for it, or in any other capacity, any part of the money paid by the defendants for said leases; that any of said money had passed through the bank, that the bank had through its president, or otherwise, agreed for Crumpton to execute said leases to defendants; that it had through its president made an agreement with the defendants that it would guarantee to them that they would be able to work the timber on these lands as provided in these leases, or if it became necessary the bank would take up the indebtedness due to the insurance company, or purchase the lands if sold by said insurance company, and would thus protect the defendants in such rights as they had acquired under said leases. The bank further set up that Robinson, as its president, had no authority from it to agree to such leases, or to make the agreements with the defendants above stated. Subsequently the defendants paid to Crumpton a second payment of $100 on the rental under these leases.

On interlocutory hearing the parties introduced evidence tending to establish their contentions in reference to these leases. The judge denied the temporary injunction prayed for, and in his order it was provided that it would not in any way determine or affect the right of the plaintiff to sue the defendants for the purchase-price of the timber cut or damages to the same; and it was directed that the defendants make no further payments on the leases, but to pay such amounts to the plaintiff or hold the same subject to its order. To this judgment the plaintiff excepted.

■ ■  Did the president of the plaintiff bank, by virtue of his office alone, have the power to agree in behalf of the bank for Crumpton to lease to the defendants the pine timber on these lands of the bank for turpentine purposes, and to make the agreements which the defendants set up that he made with them and which

are fully set out above? It is difficult to define with precision the powers of a president of a bank. He is but the executive agent of the board of directors of a bank. He is not the corporation itself. He can not take the place of the governing board, and make contracts or incur liabilities which lie outside of the ordinary business of the bank, without special authority. 3 R. C. L. 440, § 66. The question then arises, what matters come within the ordinary business of the bank, and which the president can transact and bind the bank without special authority? The answer to this question is fraught with difficulty; and the authorities are not in harmony. The holdings of the courts upon this subject are extensively set out in 7 Corpus Juris, 547, (§ 158) d. Comparison of decisions referred to in this section with the decisions of this and other courts will disclose the great diversity of opinion upon the question with which we are dealing. This brings us to consider how this matter stands under our law and decisions. The business of a banking corporation of this State is by statute expressly put under the management and control of its board of directors. Civil Code (1910), § 2267. In *Minnesota Lumber Co. v. Hobbs,* 122 *Ga.* 20, 24 (49 S. E. 783), this court approved the doctrine laid down in 2 Cook on Corp. § 1716, that, as a general rule, the president of a corporation has no inherent power to contract for it; and that unless its powers are enlarged by the charter or by-laws, his duties are confined to presiding and voting as a director. In that case the contract sought to be enforced was alleged to have been made with both the president and the superintendent of the corporation; and it was held that the plaintiff in that case had the right to assume, in the absence of any limitation in the charter or by-laws, that the superintendent had authority to contract in behalf of the corporation without special authority from the board of directors. In view of this fact, it can not be held that this court is committed to the doctrine that the duties of the president of a bank, unless his powers are enlarged by the charter or by-laws, are confined to presiding and voting as a director. This rule is considerably relaxed where the president, with the knowledge and acquiescence of the directors, exercises full control over the bank's affairs. 1 A. L. R. 694, and authorities cited under paragraph 1 of this annotation upon the powers of the president of a bank.

In *Third National Bank* v. *McCullough,* 108 *Ga.* 249 (33 S. E. 848), it was held that "The president of a chartered bank, being its alter ego, and therefore presumptively the official in charge of its affairs, an entry by a proper officer showing personal service on him of a summons of garnishment directed to the bank, is prima facie evidence of lawful and sufficient service upon the corporation." The statement in that decision that the president of a chartered bank is its alter ego is not to be taken as announcing the principle that the president of a bank in all matters is the alter ego of the corporation, but as holding only that he was such in the matter of the service of the summons of garnishment. In a number of cases this court and the Court of Appeals have held that the president of a corporation, merely by virtue of being such, has no power to bind the company by a contract, but such authority must be conferred generally or specially in individual cases. In *Potts-Thompson Liquor Co.* v. *Potts,* 135 *Ga.* 451 (3) (69 S. E. 734), this court held that "The president of a corporation has not, by virtue of his office alone, authority to contract in its behalf." In that case the contract dealt with was one of leasing of real estate made by the corporation. This doctrine was again announced in *Taylor* v. *Friedman Co.,* 152 *Ga.* 529, 531 (110 S. E. 679). In that case a suit against a Georgia corporation was instituted in a court of New York, and service was perfected upon its president, who was found in that State. Thereupon the president employed counsel to defend the same, who made a general appearance by filing an answer to the suit, and by claiming a set-off in favor of the company against the plaintiff. This court held that the power to waive the right of the corporation to be sued in the courts of its residence was not within the general and implied powers of its president or other officer. In *Swindell* v. *Bainbridge State Bank,* 3 *Ga. App.* 364 (60 S. E. 13), it was held that "The president of a bank has no power to bind it, except in the discharge of his ordinary duties, and it is not one of his ordinary duties to release debtors of a bank from the payment of their obligations to it. Release from the payment of notes executed to the bank is made under the authority of the directors; and an unauthorized agreement by the president of a bank, that the maker of promissory notes made payable to the bank shall be released from payment, does not bind the bank." In *Ocilla So. R. Co.* v. *Morton,* 13 *Ga. App.* 504

(79 S. E. 480), this doctrine was again announced, and that the presumptive authority of a president of a corporation extends only to presiding and voting as a director. The case involved the liability of the railroad company under a contract made by its president for a right of way through the lands of the plaintiff. In that case the contract involved was one lying outside of the ordinary and customary powers of the president; and it was properly held that the presumptive authority of the president to make the contract sought to be enforced was not binding upon the company merely because it was made by the president. The court held that the contract, even if made without authority, was ratified by the company, and that the company became bound thereby. In *Wilkins* v. *Friedman*, 37 *Ga. App.* 141 (2) (139 S. E. 113), the Court of Appeals held that "Ordinarily the president or other executive officer in charge of a bank has no power to bind it except in the discharge of his ordinary duties."

It will thus be seen that this court and the Court of Appeals have adopted the principle that the president of a bank can not, by virtue of his office alone, make contracts or agreements which will bind the corporation, except in the discharge of his ordinary duties. It appears from the facts in the record in this case that the president of this bank was not authorized by the board of directors to make the agreements which the defendants set up and seek to enforce in this case. In *Merchants Bank* v. *Rawls*, 7 *Ga.* 191 (50 Am. D. 394), it was said that the president of a bank, without authority from its board of directors, had no authority to sell judgments which were the property of the bank. The president of a corporation, in the absence of authority under its charter, by-laws, or resolution of its directors, has no power to sell its property. *Brown* v. *Bass*, 132 *Ga.* 41 (63 S. E. 788). The pine trees growing upon these tracts of land, which the defendants were undertaking to work for turpentine purposes, constituted a part thereof. *Peacock* v. *Horne*, 159 *Ga.* 707, 721 (126 S. E. 813); *Shirling* v. *Security Loan & Abstract Co.*, 167 *Ga.* 489 (145 S. E. 840). The purpose of the agreements which the defendants allege that the president of the bank made with them was to authorize Crumpton to sell to the defendants the pine trees on these lands suitable for turpentine purposes. This timber was the property of the bank. This being so, the president of the bank was without authority by

virtue of his office to authorize Crumpton to sell it to the defendants. This did not come within his ordinary duties; and his agreements, though ostensibly made for the bank, that Crumpton could lease this timber to the defendant, were not binding upon the bank.

But it is insisted that the bank is estopped from asserting title to the pine timber embraced in the leases from Crumpton to the defendants. This contention is based upon these facts: The bank held a deed from Crumpton to the land upon which this timber is located, to secure debt. This deed was made subject to a prior security deed to these lands by a former owner thereof. The bank had advanced money to Crumpton during the years 1927 and 1928, to enable him to conduct his farming operations upon these lands. In 1929 Crumpton again had to procure money to operate his farm on these lands. To do this he offered to lease the pine timber on these lands to the defendants for turpentine purposes. The defendants contend, that, knowing of the existence of the above security deeds against these lands, they inquired of J. D. Robinson, the president of the bank, if the bank was willing for Crumpton to lease the timber on these lands to them for said purposes. They assert that Robinson, in response to this inquiry, stated to them that the bank had agreed with Crumpton to furnish him money for the purpose of carrying on his farming operations, and that the bank was entirely willing that Crumpton should lease this timber to them, as this would make it unnecessary for the bank to advance him money for the cultivation of these lands. The defendants allege, that, acting upon this statement by the president of the bank, Crumpton executed to them the leases to this timber, which they took to the bank and exhibited to Robinson; that they again inquired of Robinson if the bank was willing for Crumpton to execute these leases to them; that Robinson stated that this was entirely agreeable to the bank; and that thereupon they paid to Robinson for the bank the initial payment of $100, which Robinson immediately turned over to Crumpton to be used by him in conducting his farming operations on these lands. Thereupon Crumpton delivered these leases to the defendants. The rental payments under these leases were payable to Crumpton; but the defendants contend that the initial payment under these leases was handed to Robinson and by him turned over to Crumpton. The evidence discloses that the bank did not get this payment, and received no benefit there-

from. There is nothing in the record to show that this initial payment, which the defendants contend was turned over to Robinson and immediately handed by him to Crumpton, was to be treated as a loan from the bank to Crumpton. The evidence discloses that the execution of these leases and the facts attending their execution were not known to the directors of this bank. Before this first payment was made under these leases, the defendants contend that Robinson expressly agreed that the bank would protect them against the Penn Mutual Life Insurance Company, and would either pay this indebtedness or buy the property if sold by the insurance company under the power of sale contained in its security deed. The defendants insist that as Robinson entered into this contract with them in behalf of the bank, and as its president had received for the bank the money paid by them on the first rental payment under these leases, and expressly agreed for the bank that it would protect them against the security deed of the insurance company, the bank can not now, after the defendants have parted with their money and have made other payments to Crumpton in pursuance of the contract made by Robinson in behalf of the bank, deny the right of the defendants to work the timber under and by virtue of these leases, executed under the above circumstances.

We have seen that Robinson by virtue of his office as president had no authority to bind the bank by these agreements in its behalf as above set out. The record discloses that no express authority was granted by the bank to its president to enter into these engagements in its behalf; and that none of these engagements and agreements between its president and the defendants were known to the bank, other than the fact that the defendants alleged and testified that Robinson as president of the bank, and in its behalf, entered into these agreements with them. The bank had no knowledge that this initial payment had been handed to its president by the defendants, and that the same was immediately turned over to Crumpton. Under the equivocal evidence in this case it can not be held that the bank got the benefit of the initial payment on these turpentine leases, or knowingly received such benefit after acquiring knowledge of the transaction. In these circumstances is the bank estopped to deny the authority of its president to make the above agreements, if they were in fact made, which Robinson denies? As we have seen, Robinson as president of the bank, by virtue of his office

alone, had no authority to make these agreements. He had no authority as such officer to dispose of the timber upon these lands, title to which was in the bank. As these agreements on the part of the president of the bank were null and void because of his lack of authority to make them, can they operate by way of estoppel to defeat the title of the bank? If these agreements, which the defendants allege were made by the president of the bank, were not binding on the bank, for lack of authority of the president to make them, how can they be used to estop the bank from asserting its title to these lands and the timber thereon? If they could be properly attributable to the bank because made by its president with authority to make them, it could with some show be claimed that they operated as an estoppel against the bank to assert its title to these lands. If these statements and agreements were inoperative to bind the bank, because of lack of authority in its president to make them, they can not operate to estop the bank from denying its title to this timber. If it had been shown that these agreements and statements were made by the president of the bank with authority, then they would be the agreements and statements of the bank, and there would be some ground for the claim that the bank was estopped thereby from asserting its title to this timber. It is not contended by the defendants that the president of this bank had any authority from its directors to make the agreements set up, to waive the rights of the bank to this timber, and to permit Crumpton to lease the same to them for turpentine purposes. On the contrary it appears that the president had no such authority. Whatever may be the powers which a president may exercise by virtue of his office, Robinson had no implied power to enter into an agreement by which Crumpton was to lease the timber on these lands in his own right to the defendants for the purpose of enabling him to procure money with which to operate his farm on these lands.

We must bear in mind that the estoppel here is one which relates to the title to land. In such circumstances, the party claiming to have been thereby induced by the other's acts or declarations must not only be ignorant of the true title to the land but also of any convenient means of acquiring such knowledge. Where both parties have equal knowledge or equal means of obtaining the truth, there is no estoppel. Civil Code (1910), § 5737. Under this principle,

when a party relies upon an estoppel to defeat the title of the true owner to land, he must be ignorant of the true title. In this case the defendants knew that the title to this land and the timber thereon was in the plaintiff bank. For this reason they can not now set up an estoppel against the plaintiff. The principle announced in *Equitable Loan &c. Co.* v. *Lewman,* 124 *Ga.* 190 (52 S. E. 599, 3 L. R. A. (N. S.) 879), that the true owner of land may estop himself from asserting title thereto, when he stands by and allows land belonging to him to be sold to an innocent purchaser for value as the property of another, does not apply in this case. There can be no innocent purchase of land by one who knows that he is acquiring the title or interest therein of one who has no title to convey. The principle ruled in *Northington* v. *Granade,* 118 *Ga.* 584 (45 S. E. 447), is likewise inapplicable under the circumstances of this case. In that case there was involved a solemn admission under oath of the true owner that he had authorized his wife to sell his land, and the wife sold the land belonging to her husband under authority given by him to her to sell it. The husband swore that he had authorized her to make a deed to whomsoever she chose. In that case this court held that this testimony of the husband amounted to a solemn admission under oath in judicio, which would bind him and protect the purchaser who bought in ignorance of the wife's lack of title. So we are of the opinion that the plaintiff is not estopped upon the theory that it had received and enjoyed the benefit of the initial payment paid by the defendants to Crumpton for the privilege of working this timber for turpentine purposes, there being no evidence that the money was received and enjoyed by the bank; or upon the theory that the bank had retained the benefits of the transaction after acquiring knowledge thereof. If the bank received the initial payment under these leases, in ignorance of the fact that it was derived from the sale of its own timber, it would not be estopped from asserting title as against the lessees. Under such circumstances it might be required to account for the money received by it from the lessees, but it will not be estopped from asserting its title to the timber leased. *Garbutt* v. *Mayo,* 128 *Ga.* 269 (3) (57 S. E. 495, 13 L. R. A. (N. S.) 58).

It follows from the above rulings that the trial judge erred in not restraining the defendants as prayed.

*Judgment reversed. All the Justices concur.*