## 2. DAVIS v. KIRKLAND.

1. The decision of every issue of fact is exclusively for the jury.
2. A verdict should not be directed unless there is no issue of fact, or unless the proved facts, viewed from every possible legal point of view, can sustain no other finding than that directed.
3. Where there is conflict as to any material issue of fact, it is erroneous to direct a verdict.

Complaint, from city court of Douglas—Judge Roan. January 16, 1906.

Argued January 8,—Decided January 11, 1907.

C. A. Ward, P. L. Smith, W. W. Bennett, for plaintiff in·error.

·RUSSELL, J. H. Kirkland brought suit against Mrs. R. B. Hall. He asked to recover money paid to her for timber for turpentine purposes. He alleges that he parted with his money upon condition that it should be repaid to him or to the party who might gain a certain mentioned case, then pending in the superior court. He averred that Mrs. Hall (now Davis) lost in that suit and refused to pay him as agreed. During the trial the petition was amended by striking H. Kirkland and inserting the words H. & D. Kirkland. The defendant filed a general demurrer, and also demurred specially: (1) Because it is not alleged that he took any warranty for his lease, that he was ever ousted therefrom, or attorned to any one else with the consent of the defendant. (2) Because the promise alleged was without consideration. (3) Because plaintiff in no way connected himself with the suit in Coffee superior court referred to. These demurrers were overruled. We think they should have been sustained, but, in view of what is said hereafter, it is not necessary now to pass on them.

The defendant, in her answer, though she did not remember the exact amount of money paid her, admitted all of the plaintiff's allegations, except as to the promise to repay. She denied absolutely that there was ever such an agreement on her part as was alleged by the plaintiff upon that subject. The controlling, and indeed only, issue of fact raised by the pleadings was, whether the defendant promised to return the money to the plaintiff upon the terms and conditions he set up. The judge directed a verdict for the plaintiff, and the defendant excepted.

There was evidence in behalf of the contentions of both parties. The legal quarrel, begun in the pleadings, warmed into a well-

drawn battle in the testimony. And the lines of the two armies of fact at issue did not harmonize or fraternize any more after the heavy cannonading of the witnesses than they did at first in the desultory firing along the picket lines of the pleadings. For .this reason, we think the judge erred in directing a verdict. In a Georgia trial the judge is the impersonation of the law he expounds, construes, and enforces. The jury is the sole arbiter—the only god of battles—to still the conflict and decide the victor, in the struggle between antagonistic testimony marshaled under opposing leaders, each contending for supremacy. After the legal battle lines have, by the permission of the judge, moved from the skirmishing of the pleadings into full action and real conflict between contending statements of fact, he is transformed into a mere representative of a neutral power, friendly alike to both belligerents,— the law,—who will see that there is no violation of those rules of war, enforced by law, and that neither combatant shall smuggle or receive from the territories of law any contraband of war in the form of illegal evidence. The law, whose representative he is, is friendly to both. But he can not stop the conflict as long as it proceeds under law's rules of war. Should the two armies meet, panoplied in their pleadings, and either fail to fight, for the total lack of the ammunition of evidence, then, as the representative of his country, the law, he declines to recognize a state of war, and makes no protest when the victor overruns and absorbs his opponent's territory. If they fight until the arbiter of battles of fact, the jury, decides the conflict and acclaims the victor, the judge then only embodies in his judgment proclamation to the world at large of the law's recognition and approval of the substantial results accruing to the victorious party.

In the justly ordered universe of jurisprudence there has never been friction between these separate nationalities, the law and the evidence. Law has ever held a protectorate over facts, and guarantees its autonomy. These nations differ greatly in intrinsic characteristics. The law is serene and conservative through the ages, and peace and order are universal in her wide domain. The territory of facts is in well-nigh constant revolution, and its every inhabitant is volatile, erratic, or capricious, and especially inclined to change his costume or disguise himself at the behest of each new forensic tailor. The law does not exercise her suzerainty over

the domain of evidence with an iron hand with a view of enforce-ing absolute peace among its inhabitants, because the very reason for her sovereignty is found in certain, continual, and irrepressible feuds and dissensions. Frequent as are these contentions, and however well calculated to tax the patience of law's ministers, the law will not allow her judge to enter the domain of evidence while it is unsettled, nor even to express an opinion as to which side should win.

·Since the birth of Magna Charta,—one of law's leading citizens, —whenever internal dissension or revolution arises in the territory of evidence, to determine which contending faction shall be enti-tled to the jewel truth, she calls in, as sole arbiter to settle the dis-pute, jury, who under law's irrevocable appointment shall settle, in every nook and corner of law's protectorate,—the domain of facts,—all issues, great and small. The wisdom of all men most enlightened, the experience of those most familiar with the prac-tice, the innate sense of justice, all concur in the opinion that dis-putes between such varying and variable characters as visit and inhabit the domain of facts can not be satisfactorily adjusted and finally determined by any umpire more absolutely reliable and just than the jury.

In the very beginning of its official existence this court desires to place itself on record as standing for the exclusive right of the jury to determine every issue of fact in the trial of every case in Georgia. And we so willingly and cordially follow the decisions of the Supreme Court in the 63 *Ga.* 85, and 89 *Ga.* 571, that we quote from them, not only as an expression of our views, but also, if possible, to emphasize them as a proper construction and analy-sis of the separate functions of our judicial system. It is true that the rulings quoted related to grants of new trial, where the jury had passed upon the evidence, while in the present case the complaint is that the court made the verdict instead of the jury; but the principle is the same. In *Central R. R. Co. v. Ferguson,* 63 *Ga.* 85, Judge Bleckley says: "The evidence is not conclusive. It pushes the mind into that great pitfall called doubt, and there leaves it. The jury are the best doctors of doubt that we know of." In *Richmond & Danville R. Co. v. Allison,* 89 *Ga.* 571, Judge Gober, delivering the opinion, says: "These dicta could be multi-plied indefinitely from the hundreds of cases wherein this point

has been considered. This much is offered, not that it is new, but it is profitable. There is no safety except in standing on the rule. . . The jury has passed upon the case as presented, and their conclusion is embodied in this verdict. The argument that a verdict is the result of prejudice and bias is one that is easily made; it is the baldest of platitudes and can be offered in the face of almost any state of facts. It is no concern of the appellate court what verdict is rendered, where such finding is proper and fair from the evidence. The prevailing party who gets a verdict has a property right in it; the court that sets it aside without some sufficient reason forgets the constitution which declares that the right of trial by jury shall remain inviolate. . . The appellate court, as the expositor of the law, must obey the law; it is bound by the law as other courts are bound by it; it must follow precedent as other courts follow it. . . Courts must take the verdicts of juries, when proper from the evidence, as a right conclusion as to what is the truth of a case. . . Whoever has had any experience with juries must concede that they endeavor to do right. They take questions of fact in a practical way, unimpeded by the legal fetters that restrain a professional mind. They may not find sometimes as a court would find. The reply is, the law has left this work to them. If they do their work fairly under the rules, courts ought not to disturb their verdicts. In 'Trial by Jury,' by Forsyth, he says: 'It was said of Socrates that he first drew philosophy from the clouds, and made it walk upon the earth. And of the civil jury it may be also said that it is an institution which draws down the knowledge of the laws to the level of popular comprehension.' From this standpoint, in a practical way, by practical men, verdicts are made. . . When we reflect that the ultimate object of all our laws is to put twelve upright and intelligent men in the jury-box, before whom the humblest citizen may demand redress for any invasion of his rights, the matter is seen as it is and assumes its true importance."

No principle is better settled in Georgia than that a verdict should not be directed, unless there is no issue of fact; or unless the proved facts, viewed from every possible legal point of view, can sustain no other finding than that directed. In this case the plaintiff swore that the defendant agreed, in a certain contingency, to pay back certain money. The defendant swore just as unequivo-

cally and positively that she made no such promise. It only adds force to the statement to say that both parties were corroborated. In such situations, as remarked by Judge Bleckley, the jury is the only doctor our law will permit to prescribe. "Where the evidence on the controlling issue in a case is conflicting, it is error for the judge to direct a verdict in favor of one of the parties." *Colson* v. *Meyers,* 80 *Ga.* 499. The paramount right of the jury to decide any issue of fact in every case, in Georgia, is absolutely exclusive of any such prerogative on the part of the judge. The exercise of this power by the jury, unless waived by the parties, is an indispensable requisite of a legal trial in this State, and an invasion of this right (as has been held by our Supreme Court times without number) demands the grant of another trial.

It is true that the code now authorizes verdicts to be directed. "Where there is no conflict in the evidence and that introduced with all reasonable deductions or inferences therefrom demands a particular verdict, the court may direct the jury to find for the party entitled thereto." Civil Code, § 5331. To the mind of the writer the fact that this section was engrafted upon the code by the codifiers; by modification of language used in *Hooks* v. *Frick,* 75 *Ga.* 715 (a case that was itself submitted to a jury, and that after argument by counsel and charge by the court), and not codified (as is usual) from a statute passed by the General Assembly, is quite significant. When, however, the seal of legislative enactment was placed on the entire code, it became the law. Speaking for myself, I think that the opinion rendered by Chief Justice Jackson in *Manning* v. *Mitchell,* 73 *Ga.* 665, when he said, "On what principle the case was decided by the court below, we can not see. Indeed, unless it is a case which is so plain that it would be useless to send it back, it would be done because the court directed the verdict, *which, under Georgia practice, it had no power to do,"* is in keeping with the principles of our constitution. And I can hardly believe that this great judge ever expected that his decision on the precise question of directing verdicts, quoted above, would be overturned by his own language, used when the question being discussed was the right of the judge, under "the dumb act," to intimate an opinion on the evidence, and when the court was holding that a judge may, in his charge, assume and assert the existence of any fact proved and not controverted. The doctrine of permitting

a judge to direct a verdict originated in affirmances of verdicts in cases where the finding was so absolutely required, under the facts in those particular cases, that for this reason the Supreme Court held the error harmless. One of the stages of this gradual evolution can be seen in *Hobby* v. *Alford, 73 Ga.* 791. First considered an error, but not reversible if harmless to the losing party, after many evolutions it finally received legislative sanction in order to economize time. But if §5331 be analyzed, the word "may" imports no command, it is merely permissive, and is weighted with the implication that the power is to be most carefully and cautiously exercised in those cases—and those only—in which there is no possibility of doubt or dispute as to the evidence. And the words *"no conflict"* are so sweeping and full of meaning as to withdraw the permission if there be even the slightest conflict in the testimony. When each proved fact has been subjected to every possible analysis, and there is only one solution which will fuse them into homogeneity; when the light has been thrown on the evidence from every direction, and it presents but one view; when it is certain that no other verdict than that directed could be found or stand, then a court may direct a verdict. And this because the case has resolved itself into a question of law. Having noted the birth and descent of §5331, we will say that we shall follow this section (sprung from the union of judicial construction and legislative acquiescence, ushered into our legal world by the midwife of codification, and its paternity only admitted because it finds itself in the household of the code) as the law, where we are bound to do so, but not a step further.

In view of the fact that we hold that the directing of a verdict in the case was such error as demanded a new trial, it becomes unnecessary to consider the various other assignments of error. If error was committed as to any of these, the learned trial judge will no doubt correct it on the next hearing.

*Judgment reversed.*