1. A defect in a petition resulting from nonjoinder of proper parties can not be taken advantage of by a general demurrer. As to such matters a special demurrer is necessary. Greenwood v. Starr, 174 Ga. 503 (2) (163 S.E. 500); Grant v. Hart, 192 Ga. 153 (4) (14 S.E.2d 860), and cit. Where there is no administration of the estate of a decedent, a plaintiff may proceed in equity against the heir at law, and persons holding under the decedent. Mims v. Lifsey, 192 Ga. 366 (2) (15 S.E.2d 440). It appearing that there had been no administration of the decedent's estate, and that the defendant as his widow was the person entitled to ask for letters of administration under the Code, § 113-1202, the petition was not subject to demurrer on the ground that the representative of the estate was not made a party defendant. A different ruling is not required by Camp
v. King, 193 Ga. 3 (17 S.E.2d 65), and similar cases, where it did not appear that the estate was unrepresented.
2. A party is not obligated to return that which he will be entitled to retain, as a condition precedent to a recovery in equity. Georgia Railroad Bank Trust Co. v. Liberty National Bank Trust Co., 180 Ga. 4 (5) (177 S.E. 803). The petition in this case, which alleged that the money physically handed to plaintiff when she was coerced into signing the deed was her own money, and that she was required to return the same three days later, was not subject to demurrer on the ground, as contended, that she had not restored or offered to restore the consideration that she had received when the deed was executed.
3. There is no absolute rule as to what constitutes laches or staleness of demand, and no one decision constitutes a precedent in the strict sense for another. Each case has to be determined according to its own particular circumstances. Miller v. Everett, 192 Ga. 26, 34 (14 S.E.2d 449), and cit. In the instant case all the acts complained of were alleged to have occurred between February 27, 1939, and the death of decedent on September 2, 1941. The petition filed on October 13, 1941, was not subject to demurrer on the ground, as contended, that the complainant had not been diligent and was guilty of laches.
4. There is no merit in the contention that the action should have been dismissed because there was an attempt to attack collaterally a judgment of a court of competent jurisdiction, which judgment was legal upon its face, for the reason that this proceeding was instituted to set aside and cancel the judgment in the same court which rendered the judgment. 34 C. J. 520, § 827. See Dixon v. Baxter, 106 Ga. 180
(32 S.E. 24), and Schulze v. Schulze, 149 Ga. 532, 534
(101 S.E. 183), where it was said: "The only method by which it can now be set aside is by instituting a proper proceeding for that purpose in the court wherein such judgment was rendered." *Page 214 
The court did not err in overruling the demurrer to the petition, as contended in the cross-bill of exceptions.
5. The evidence as a whole would have authorized the jury to find that a married woman owning a home on Pelham Road and a tourist camp known as Rose Garden, first, was coerced by her husband on December 1, 1938, into selling the home to a third party, the husband taking the proceeds; second, the wife was coerced (notwithstanding the provisions of the Code, § 53-504, were apparently complied with), on March 10, 1939, into conveying the tourist camp to her husband, he giving her the proceeds from the first sale which she used with other funds in purchasing a Florida hotel, the husband jointly signing second mortgage notes with the wife, and causing her to convey the Florida hotel property back to him, subject to an interest by the wife, as long as she remained sane; third, on July 24, 1939, the husband and his attorney at law induced the wife to enter into an alimony agreement stipulating that the wife had received $570, and providing that the husband would pay the notes he had jointly signed in connection with the second mortgage; the husband also executing a deed to the wife, conveying the tourist camp which had not cost him anything, as security and guarantee that he would comply with the alimony agreement, such security deed not being recorded but held by the husband's attorney; fourth, that on August 24, 1939, the husband executed a deed conveying the Florida hotel to the wife, she expressly agreeing to pay the jointly signed second mortgage notes, thus leaving the husband with title to the tourist camp with no cost to him; fifth, that a divorce was obtained on August 25, 1939; sixth, that the husband remarried on the next day, executed to the second wife a deed of gift dated March 12, 1940, and died on September 2, 1941; seventh, that the second wife, never having been called upon to pay the second-mortgage notes which were not due, conferred with the attorney of her deceased husband, who advised that she should pay them, and on September 13, 1941, procured an agreement with the owners of the notes to allow ten per cent. discount if they were paid by October 1, 1941. Held, that the jury would have been authorized to find that the first wife was the victim in a scheme whereby her then husband by duress and fraud obtained title to her property. A different result is not required because the evidence showed that the first wife filed a petition on September 24, 1941 (nineteen days before the instant suit), seeking to have the security deed held by her declared a prior lien to the deed of gift held by the defendant; it appearing that the suit first mentioned was filed by attorneys in Atlanta who knew nothing about the early history of the case, such attorneys having been employed by correspondence with the plaintiff, who was ill in Florida, "in no mental condition to protect her interest in a business transaction," and for the purpose of that one transaction only. Nor is a different ruling required because the defendant, on September 26, 1941, paid the Florida hotel notes before they were due, no demand having been made upon her to make such payment either in the first suit or otherwise. The evidence showed that the first suit was based on a wholly different wrong from the cause of action in the instant case. In all the circumstances the evidence did not demand a *Page 215 
finding for the defendant on the theory of res judicata, estoppel, or election of remedies, but would have authorized a finding in favor of the plaintiff. The judge erred in directing the verdict.
 Nos. 14308, 14309. NOVEMBER 18, 1942. REHEARING DENIED DECEMBER 15, 1942.
On October 13, 1941, Mrs. Jean Hughes filed in Clayton superior court, against Mrs. H. L. Cobb, a petition which as several times amended, alleged substantially the following: Previously to March 10, 1939, the plaintiff was the owner of described real estate valued at $30,000, known as the Rose Garden Court. Her then husband H. L. Cobb, was thirty-five years of age, of powerful build, being more than six feet in height and weighing more than two hundred pounds. He was a man of violent disposition, and habitually carried a pistol. Cobb used duress when he wanted plaintiff to sell another piece of property known as 1652 Pelham Road in Atlanta. Through threats and coercion on the part of Cobb, plaintiff was forced to file in the superior court a petition asking that she be authorized to sell to him the property known as Rose Garden. After the order had been entered, the plaintiff was forced and coerced into executing a deed conveying the property to him. The consideration of $10,500 was plaintiff's own money that her husband held as trustee for her after sale of the Pelham Road property, and the above amount was again taken from plaintiff three days later, at Cobb's instance. The money was used by Cobb's agent in buying designated Florida hotel property in plaintiff's name, she being required contemporaneously to sign a deed conveying the property to Cobb. The only interest retained by plaintiff was a life-estate or as long as she remained sane, she to collect rents and apply them in payment of an existing mortgage, which would take about thirty-three years to pay; Cobb retaining title in the equity until August, 1939. Cobb also induced plaintiff to sign an alimony settlement, which had been drawn entirely for his benefit. In connection with the alimony settlement the plaintiff was to receive a security deed to the Rose Garden Court property. This deed, which Cobb refused to deliver to her, was not recorded, but was kept in escrow by Cobb's attorney. While the security deed was supposed to protect the plaintiff in the payment of so-called alimony, it in fact merely secured the payment of *Page 216 
Cobb's mortgage on the Florida property. The plaintiff was also required to sign a receipt for $570, but the money was not paid to her. She alleged in detail that all of her acts and doings were under duress and fear of death, she being an ill woman, and Cobb a powerful man. In August, 1939, Cobb through duress forced her, against her wishes, to apply for and get a divorce in Florida, all details of which were handled by his attorneys; after which he married the defendant, who had full knowledge of the above scheme to take away plaintiff's property from her. After this marriage Cobb continued his threats, and the plaintiff was afraid to assert any rights against him. On March 12, 1940, Cobb executed a deed of gift conveying the Rose Garden property to the defendant, and died on September 2, 1941. There is not now and never has been a representative of Cobb's estate. The plaintiff is not the heir at law or next of kin, nor is she the creditor of Cobb, and for that reason she can not apply for letters of administration of his estate. She is willing and desires to name as a party defendant any person who may be appointed as representative, and offers to name such person as a defendant when such representative shall be appointed. She "offers in all things to do equity, and consents that any decree or judgment herein rendered may be molded in such manner as may be just and proper." She prays, (a) that the order signed by the judge of the superior court, dated March 2, 1939, allowing sale of the Rose Garden property to her husband, be decreed void; (b) that the deed executed by the plaintiff conveying the Rose Garden property to Cobb, dated March 10, 1939, be decreed void; (c) that the deed by Cobb conveying the Rose Garden property to the defendant, dated March 12, 1940, be decreed void; (d) that a receiver be appointed; (e) that the defendant be enjoined from encumbering or transferring the property; (f) for recovery of the Rose Garden property, with mesne profits; and (g) for general relief.
The defendant's demurrers on general and special grounds were overruled, to which ruling she excepted pendente lite.
There was evidence, although as to some of it there was conflict, as follows: Mrs. Jean R. Hughes (the plaintiff) was raised an orphan, and went through only the fifth grade in grammar school. She married H. L. Cobb on December 12, 1933. Cobb was a man six feet two inches tall and weighed two hundred and forty-five *Page 217 
pounds. During January, February, and March, 1939, the plaintiff was suffering from physical injury, was not able to sleep at night, her thumbs and hands ached, and she was under dreadful fear and worried to death.
In October, 1935, Mrs. W. M. Golson executed to the plaintiff a deed conveying property known as 1652 Pelham Road N.E., for which the plaintiff paid $8750.
On April 22, 1936, Helen D. Schroeder executed to the plaintiff a deed conveying a tourist camp known as the Rose Garden, the stated consideration being $5250.
On December 1, 1938, the plaintiff executed to Mrs. J. A. Flemister a deed conveying the Pelham Road property. The plaintiff testified: "That property was sold. I didn't sell it. . . I never did sell that property. I signed a deed for it. I didn't sell it myself. I didn't have anything to do with it. . . I signed that deed. Mrs. Flemister paid for that property eighty-two hundred and something dollars. I saw the money. When this transaction took place, Mr. McNabb — he was a real-estate man, he came down and got me and took me up there to his office, and he said that he had the house sold, and I told him I didn't want to sell the place. . . Mr. McNabb took me to his office in the First National Bank Building in Atlanta, and he had a sale for the property, and of course I had to sign the deed. . . When I signed the deed they put the money on the table, . . and Mr. McNabb got up and took it and folded it up and put it in his pocket. I asked him when I got back to his office for the money. He was not my agent. Prior to the time he took that money I had never listed that property with him to sell. I had not ever listed property for sale with McNabb anywhere or any place. To state the conversation between me and McNabb at the time he took the money, well, after they closed the deal there in quite a while they gave a thirty-day note for $300. . . He says, `I will take you out here on West Peachtree and give it to you out there,' so I went with him out on West Peachtree. As to whether he got the money in one office and went to another office in the First National Bank, it was his office; he had an office there. . . I did not get the money. . . For the purpose of delivering the money to me he took me out on West Peachtree, on a corner at Fourteenth Street to a store. He went in the store. The last time I saw the *Page 218 
money, Mr. McNabb was counting it out on a desk. There was somebody present other than Mr. McNabb and me." A letter from George B. Tidwell to the plaintiff, dated September 27, 1939, stated that Cobb told him that the proceeds from the sale of the Pelham Road house, as well as the note, were turned over by the plaintiff to Cobb "immediately upon the consummation of this deal." The letter suggested that the plaintiff ought to "let by-gones be by-gones; . . if I were you, I would let the matter drop, because it might give you more worry than the amount now in controversy to collect the moneys that would be due in the future. It is my impression that Mr. Cobb is not mad; and I am going to assist you and see that Mr. Cobb pays the money at the time it is due. I believe that you know I am trying to see that the right thing is done between both of you. If there is anything I can do for you here, please do not hesitate to call upon me."
Miss Frances W. Richardson, a sister of the plaintiff, testified, concerning a visit in 1938 just before the sale of the Pelham Road property, that the plaintiff was sick and highly nervous, was not herself, and could not carry on a connected conversation; that while sleeping in a room next to Cobb and the plaintiff, witness was awakened late at night by loud voices. Cobb said "If you don't make this thing right, I will make it so ____ ____ hot for you you will wish you had never owned Rose Garden;" and that the plaintiff came out crying and locked the door between the two rooms.
On February 27, 1939, the plaintiff filed in the superior court a petition asking for leave to sell the Rose Garden property to her husband, H. L. Cobb. Referring to that petition the plaintiff testified, that the first time she saw George B. Tidwell was when he brought the paper for her to sign, asking permission to sell the Rose Garden property; that plaintiff never employed Tidwell and gave him no authority; that she never gave Tidwell any information concerning the petition he brought for her to sign; that McNabb was with him; that they brought her to Jonesboro to sign the petition; that Tidwell pointed out where she was to sign; that he did not offer to leave the paper to let her think over it and see whether she wanted to sign it or not; that she signed the paper exactly as Tidwell had it drawn; that she endeavored to make an *Page 219 
excuse of not wanting to go before Judge Davis, but "had to go just the same."
On March 2, 1939, an order was entered, allowing the plaintiff to sell the Rose Garden property to her husband, H. L. Cobb.
On March 10, 1939, the plaintiff executed to H. L. Cobb, a deed conveying the Rose Garden property, the consideration stated being $10,500. The plaintiff testified that she paid $5250 of her own money for the Rose Garden property, and erected twelve modern cabins. Mrs. Sarah Phillips Jones testified as to the improvements including the erection of modern cabins with bathrooms, electric heat, and planting of shrubbery; that she visited Rose Garden during the last of February or first of March (before March 10), 1939; that Cobb and the plaintiff were sitting in a booth, and Cobb was fussing relatively to the signing of a deed to the Rose Garden property; that Cobb was cursing the plaintiff, and her face and eyes were swollen; that Cobb was trying to make her sign some papers, and she would not; that Cobb said, if she did not sign them he was going to burn the ____ ____ place down, and he would just as soon kill her as not; that her place was in Florida; and that Cobb was drinking heavily at the time and carried a pistol.
Mrs. Louise Condon testified, concerning a visit to Rose Garden on March 5, 1939, that the plaintiff and H. L. Cobb were arguing; that the witness asked the plaintiff what was the matter, to which she replied: "I am almost crazy. Cobb is trying to get everything I have worked for, and he says I will have to either sign the deeds over to him or suffer the consequences;" and that Cobb said, "This is March 5, 1939; if she don't sign the papers by March 15th, you can go to her funeral." Mrs. Condon again visited Rose Garden in the summer of 1939, but did not see the plaintiff. Cobb said the plaintiff did not get full satisfaction about the $10,000 for the Rose Garden property; that it was not a dime out of his pocket.
Judge W. E. Armistead testified in reference to the plaintiff's highly nervous condition in 1939, and that H. L. Cobb offered to pay him well if he would use his influence to induce the plaintiff to convey to him the Rose Garden property and go to Florida; which was refused.
A. C. Williamson testified, that he surveyed the Rose Garden property during October, 1941, to see if he could dispose of it for *Page 220 
the defendant; that he valued the place at $25,000; and that the rental value of the cabins alone was $35 a day. John Bacheller testified that the reasonable market value of the Rose Garden property during 1941 was between $22,500 and $25,000.
I. L. Huitt testified, that he was in the building-material business; that he had lived in Jonesboro for twenty-eight years; and that the market value of the Rose Garden property was $20,000.
P. E. Mitchell, a real-estate salesman, testified, that he surveyed the Rose Garden property in November or December, 1941, with the idea of selling it; that the market value of the real estate and fixtures was in the neighborhood of $22,500 to $25,000.
On March 10, 1939 (the date when a deed to the Rose Garden property was executed), Katherine M. Fitzgerald, Mary A. Austin, and Helen F. Whatley executed to the plaintiff a deed conveying the Florida Trianon Hotel property.
On the same day the plaintiff executed to H. L. Cobb a deed conveying the Florida Trianon Hotel property. This deed states, that the plaintiff "has this day and simultaneously with the execution of this instrument purchased the above property from Helen F. Whatley, Mary A. Austin, and Katherine Fitzgerald" for $25,000; that plaintiff paid the consideration of $25,000 by paying the proceeds of a loan of $12,000 placed on said property in favor of Louis Kleeman, and $10,500 cash, and the balance of $3000 is evidenced by a second mortgage in favor of Helen F. Whatley, Mary A. Austin, and Katherine Fitzgerald; that the $10,500 was furnished by H. L. Cobb, and therefore "in consideration of the premises and in further consideration of the sum of . . $10 and other good and valuable consideration," etc.; and that the deed was subject to the first mortgage of $12,000, dated February 23, 1939, and the second mortgage of $3000, dated February 23, 1939. The deed contained the further clauses: "It is distinctly understood that this instrument is executed and this (Florida hotel) property is sold subject to the following conditions and limitations enumerated (a) through (f), both inclusive: (a) Party of the first part [plaintiff] reserves unto herself a life-estate in and into the above-described property for and during her natural life. (b) Party of the first part [plaintiff] for and during her natural life reserves the right and shall be entitled to collect and use all the rents, issues, income, and profits accruing from or arising out of *Page 221 
the above-described property. (c) Party of the first part [plaintiff] shall from the rents, issues, income, and profits pay the interest and reductions on the mortgage against said property, as well as any other liens or lawful charges that may be assessed against said property, as they mature, until said mortgages are paid in full or up and until the death of party of the first part, whichever contingency occurs first." (d) Plaintiff "reserves the right to manage, control, and collect the rents, issues, income, and profits arising out of or from said property so long as she is mentally sane." (e) In the event the plaintiff "should be adjudged a lunatic, or should be adjudged by a court of competent jurisdiction to be incapable of managing the above-described property, then and in either of said events . . [H. L. Cobb] shall have the right to manage said property, and shall account to" the plaintiff "for the net proceeds of the rents, issues, income, and profits for and during her natural life, after the payment of any interest and reductions that may be due on any mortgages on said property, and after the payment of any other liens or lawful charges that may be assessed against said property." (f) "Upon the death of" the plaintiff, "the life-estate herein reserved shall cease and terminate, as well as any and all other interest of" the plaintiff "in and into the above-described property, and the absolute title shall then vest in" H. L. Cobb, "his heirs and assigns, forever." This deed further stated that the plaintiff "represents and agrees that in executing this instrument she is executing it freely and voluntarily, without any compulsion, constraint, apprehension or fear of" H. L. Cobb. This deed and the deed conveying the Rose Garden property were each witnessed by Gordon J. McNabb, and by G. B. Tidwell, notary public.
The plaintiff testified, that she did not get any of the money for the sale of the Rose Garden property; that on that day March 10, 1939, she did not own the Trianon Hotel in Florida; that on March 13, 1939, she purchased the Trianon Hotel; that the $10,500 handed to her by Cobb, and which she turned over to McNabb, was in fact from the sale of the Pelham Road property. "I gave that money to Mr. McNabb, $10,500. I got $9600 back in the form of checks. I don't recall what happened to the other $900. [Looking at the endorsement on this check] Those people are the three sisters the Florida hotel was purchased from." Also, that the plaintiff *Page 222 
did not know that she signed the deed conveying the Florida hotel property back to Cobb until about two months before the trial of the instant case; that she did not employ Mr. Tidwell or any other attorney to prepare that deed, and nobody explained it to her; that she did not sign papers for anybody in 1939, except Mr. Tidwell, and told no one that she expected to be adjudged a lunatic; that she went to Florida to live, on April 10, 1939, and went under the care of physicians; and that her sister managed the hotel the first year. G. B. Tidwell, explaining the deed from the plaintiff to Cobb, in which she reserved a life-estate or as long as she was sane, testified, on cross-examination, that he was drafting this deed, having in mind that in the event of the plaintiff's death the property then would come back to Cobb; that was the purpose of this instrument; as to whether that was for the plaintiff's protection, Cobb's idea and thought was to try to put some cloud, so the plaintiff couldn't sell it; that as to whether that is a pretty complete cloud when it comes back to him, and was directly for his interest and not for her interest, fixing it so her interest would not be saleable, both Cobb and the plaintiff would have a substantial interest; that Tidwell was seeking to do what Cobb told him to do, to fix it so that the plaintiff's daughter and her son-in-law would not get the property; and that but for this covenant the plaintiff could have renewed the principle loan if she had wanted to.
The plaintiff testified, that when she returned to Atlanta in June, 1939, she did not do so on her own initiative; that she did not desire to return to Rose Garden; that she had been there four or five weeks when Mr. Tidwell came down with another paper for her to sign; and that she did not desire a divorce at that time.
On July 24, 1939, the plaintiff and H. L. Cobb entered into an agreement stating that the parties were married on December 12, 1933, and separated on March 19, 1939, and "desire to adjust and settle all questions of property right, including alimony; that the plaintiff is the owner of the Florida hotel property, which was purchased on March 13, 1939, the plaintiff paying in cash $10,000, which money was furnished by H. L. Cobb, there being a second mortgage on the property of $3000, represented by six promissory notes of $500 each, dated March 13, 1939, drawing interest at the rate of five per cent. per annum, payable annually, in favor of Helen F. Whatley, Mary A. Austin, and Katherine Fitzgerald, *Page 223 
which notes and second mortgages H. L. Cobb "has assumed and agreed to pay before they become in default, and as security and as a guarantee that said notes will be paid by" H. L. Cobb he has "simultaneously with the execution and delivery of this agreement" conveyed the Rose Garden property, as security and as a guarantee that said payments will be made; that H. L. Cobb "has this day paid to" the plaintiff $570 cash, "the receipt of which is hereby acknowledged." This agreement was witnessed by Gordon J. McNabb and G. B. Tidwell, notary public.
On the same day H. L. Cobb executed a security deed conveying the Rose Garden property to the plaintiff "as security and (to) guarantee the payment" of six promissory notes of $500, signed by the plaintiff and H. L. Cobb, and payable to Helen F. Whatley, Mary A. Austin, and Katherine Fitzgerald, which notes are secured by a second mortgage on the Florida hotel property, H. L. Cobb having as a valuable consideration assumed and agreed to pay said notes as they mature and agreed that the plaintiff would be held harmless. This deed was likewise witnessed. G. B. Tidwell held the security deed in escrow, and it was not recorded until September 4, 1941.
The plaintiff testified, that she had not furnished Mr. Tidwell any of the information that went into the alimony agreement, which paper she signed exactly as it was presented to her; that (referring to a provision which recites H. L. Cobb "has this day paid to" the plaintiff "the sum of $570 cash." etc.) she did not request Tidwell to put into that paper that provision; that, as to the long provision in section 1 that Cobb was to give plaintiff a security deed to secure the second mortgage and notes on the Florida property, she did not request Tidwell to put that provision in the paper; that she did not have any knowledge of such a provision until the paper was signed; that she did not furnish him any information upon which to draft that provision. "At the time that agreement was presented to me in July, 1929, as to whether I had any conversation with Mr. Tidwell about his helping me or not helping me, — well, he told me that he was going to do all he could for me, and I trusted him because he seemed to be the kind of fellow that seemed right as far as my knowledge of the way of thinking, and I trusted him and went by what he said, and done just what he asked me to do. I signed each and every paper which he presented *Page 224 
to me for signature. I did not refuse to sign any paper which he presented to me for signature. . . With reference to that [security] deed from Cobb to me, conveying Rose Garden . . I never at any time requested Mr. Tidwell not to record that paper. . . I did not at any time have any discussion with him as to whether he would record it or not."
The plaintiff "never at any time before October, 1941, saw this purported [security] deed" conveying to her Rose Garden. "Mr. Tidwell never turned such a deed as that over to me. He never did exhibit it to me. I did not read it until October, 1941."
The documentary evidence set out correspondence between George B. Tidwell and Joe H. Lesser, a Florida attorney, in reference to obtaining a divorce. The letters cautioned the Florida attorney not to mention any fees to the plaintiff, as H. L. Cobb was paying them. The Florida attorney was requested to represent the plaintiff while George B. Tidwell represented H. L. Cobb. Also, a letter from the plaintiff and H. L. Cobb, addressed to George B. Tidwell, dated August 10, 1939, confirming Cobb's agreement to pay the second mortgage, and stating that H. L. Cobb had executed a deed releasing all of his interest in the Florida hotel property to the plaintiff, the deed to be held in escrow by George B. Tidwell and delivered when the divorce was granted; that H. L. Cobb has heretofore executed a loan deed conveying to the plaintiff the Rose Garden property as security and as a guarantee that he will pay six notes of five hundred dollars each, representing the second mortgage against the Florida property. "The security deed against the Rose Garden property is to be held by you in its present condition. So long as Cobb pays the above notes as they mature, you are to continue to hold this deed, and when Cobb has paid the six notes you are to turn over the security deed to him. Should Cobb default in the payment of any of the notes as they mature, you are then to turn the loan deed over to the plaintiff, so that she may foreclose the same or take any other action she may see fit to take. The payment of $570, specified in the alimony and property settlement agreement dated July 24, 1939, will be paid by Cobb not later than December 1, 1939. Cobb will pay all of the notes on the Florida property above described through you as they mature."
John W. Whelan, a Florida attorney, testified that he received a telephone call in August, 1939, requesting him to meet the plaintiff, *Page 225 
George B. Tidwell, and McNabb at the Trianon Hotel; the latter introduced themselves as the attorney and real-estate representative of H. L. Cobb. Tidwell informed witness that a divorce suit had been or would be filed between the plaintiff and H. L. Cobb; that he and McNabb were in Florida to effect a settlement; that the purpose of Tidwell's visit was to arrange a settlement as to the Trianon Hotel, in contemplation of a divorce. Witness was employed to protect the interests of the plaintiff with respect to the hotel property; no one told him about the existence of an instrument executed by the plaintiff, by which she conveyed to Cobb the hotel subject only to her retaining possession as long as she remained sane, and applying the rents on the mortgages; his employment involved investigation of the title to the hotel property, and in so doing he discovered the deed referred to, which was recorded early in 1939; that he immediately reported this deed to the plaintiff, who did not know anything about the reservations concerning her remarriage or her sanity, and the effect of the reservation on her life-estate, and as to the remainder to H. L. Cobb; she knew nothing about what that deed meant when witness mentioned it to her upon discovering it in the public records; he had been informed that she was to have the hotel subject to the existing mortgages, and that H. L. Cobb was to divest himself of all interest he had in that property. Mr. Tidwell tendered a quitclaim deed which witness declined to advise acceptance of, because it was not an unconditional conveyance. Witness thereupon prepared a deed which was signed by H. L. Cobb. Witness was not employed to represent the plaintiff generally in the settlement, and had no knowledge of it, except that Tidwell, McNabb and the plaintiff said that the hotel was to be transferred to her as an incident in a settlement. Witness told the plaintiff that the quitclaim deed tendered by Tidwell would not bring about the desired result.
A deed dated August 24, 1939, was executed by H. L. Cobb and the plaintiff, conveying to the plaintiff the Florida hotel property, "subject to . . first-lien mortgage in the sum of $12,000, by the grantors herein to Louis Kleeman. Second-mortgage and lien by grantors herein to Helen F. Whatley," in the sum of $3000. The deed stated that the grantee (plaintiff) "herein expressly assumes and agrees to pay said mortgages." *Page 226 
On August 25, 1939, a divorce was obtained in Florida by the plaintiff and H. L. Cobb.
H. L. Cobb and Ethlyn Ledford (the defendant in the instant case) were married on August 26, 1939.
On March 12, 1940, H. L. Cobb executed a deed of gift to defendant, conveying the Rose Garden property.
B. L. Milling on April 8, 1940, wrote to George B. Tidwell a letter requesting information as to the security deed to the Rose Garden property.
H. L. Cobb died on September 2, 1941. Ten days afterward George B. Tidwell wrote to Mrs. Helen F. Whatley, Mrs. Katherine Fitzgerald, and Mrs. Mary A. Austin a letter in which he referred to correspondence early in 1940, relative to discounting the second-mortgage notes, and asking if they would accept $1800, plus accrued interest.
On September 13, 1941, these three women wrote to George B. Tidwell a letter agreeing to accept $1800, plus interest, if payment should be made by October 1, 1941, and agreeing to assign the notes to whomever Tidwell directed.
On September 24, 1941, B. L. Milling and Stephens Mitchell filed a suit for the plaintiff against Mrs. H. L. Cobb as "sole heir of H. L. Cobb." The petition referred to an agreement to extend the payment of $570; attached a copy of the alimony agreement as an exhibit; "alleged that in accordance with the agreement H. L. Cobb executed to the plaintiff a deed to secure debt," a copy of which was also attached as an exhibit; that subsequently to the security deed H. L. Cobb conveyed the Rose Garden property to the defendant; that the sale to defendant deprived the plaintiff of her rights to prior lien on the property for the purposes contained in the alimony agreement, because the property might be sold to innocent third persons by the defendant since the security deed was not of record when the deed to the defendant was recorded, but was held by G. B. Tidwell in escrow, unrecorded, in accordance with the alimony agreement; that at the time of the execution of the deed by H. L. Cobb to the defendant, dated March 12, 1940, H. L. Cobb knew that the deed to secure debt was outstanding and unrecorded, but he made no reference to the unrecorded security deed, which should have been done so as to protect the rights of the plaintiff; that the failure of H. L. Cobb to make proper reference *Page 227 
in the deed to the outstanding security deed was with the intent and purpose of divesting petitioner of her rights as a holder of a valid lien against the property described in the deed to secure debt; that the action of H. L. Cobb in so conveying the property to the defendant without disclosing the existence of the security deed was in violation of the Code, § 67-9909, making it a misdemeanor to falsely represent that property being sold is not subject to any lien; that the alimony agreement was not complied with, although so stated therein with reference to the payment of $570, except $70, payment of which was made after conference of plaintiff's attorney with George B. Tidwell, on February 15, 1940; that H. L. Cobb died on September 2, 1941, and there is no administration of his estate; that defendant is his sole heir at law. The prayers were, (a) that the deed conveying the Rose Garden property to the defendant be canceled; (b) that the security deed conveying the Rose Garden property to the plaintiff be declared a prior lien on the property for the purposes set out in the alimony settlement; (c) that the plaintiff be awarded a judgment of $500, with interest from July 24, 1939, and the judgment be made a lien on the property described herein; (d) that the defendant be enjoined from changing the status of the Rose Garden property; and for process, etc.
Two days after the above suit was filed, the defendant wrote to George B. Tidwell a letter enclosing money for stated purposes including $1812.50 to be sent to Mrs. Helen F. Whatley, Mrs. Katherine Fitzgerald, and Mrs. Mary A. Austin. On the same day George B. Tidwell procured a check for the above purpose, which was sent to the persons indicated.
On October 24, 1941 (after the action was filed in the instant case on October 13, 1941), the $567 was paid into court, which amount represented the alimony that was receipted for on July 24, 1939.
It was admitted that when the $567 was paid the defendant had full knowledge of the claims made in the present action.
B. L. Milling testified, that $570 was due to the plaintiff on an alimony settlement, and she employed him to collect, and also to attack the deed to defendant, and to establish plaintiff's security deed as a prior lien on the Rose Garden property; that his connection before the filing of the suit on September 24, 1941, was *Page 228 
through correspondence with reference to collection of the $570, and the establishment of plaintiff's unrecorded security deed, so that the plaintiff would be protected in the payment of the notes on the Florida property; that he never saw the plaintiff at all until he had filed the suit on September 24, 1941; that he prepared the suit and sent it to Florida for her to sign; that he prayed for cancellation of the deed from H. L. Cobb to the defendant, and asked for judgment of $570; that the first time he talked to the plaintiff was after September 24, 1941; that after he filed the suit, Tidwell as attorney for the defendant paid everything he had demanded; that he was not filing the suit for immediate settlement of the $2000 which was not due, but the purpose was to establish the lien, so that the security could not be disposed of; and that the prayer was to give a prior lien. He thought he would have to do that at the time; but after the suit was filed and the offer on the notes was made, there was nothing to do but accept it; that he was employed only to assert the plaintiff's rights under the alimony agreement; and that he was not employed in connection with her rights in the property arising out of the earlier transactions.
Robert R. Harris, a Florida physician, testified, that the plaintiff was under his care and observation at intervals between April, 1939, and November, 1941; that she was in no mental condition to protect her interests in a business transaction; that fear played a predominate part of the production of her mental condition.
Mary Wiseman Herndon, a registered nurse, testified, that from the fall of 1939 to the middle of 1941, the plaintiff appeared to be greatly and intensely worried mentally and seemed to be in great fear; and that at times she was so worried that she did not seem to know what she was doing.
Mrs. H. L. Cobb, the defendant, testified, that she was the widow of H. L. Cobb; that she did not know of his business transactions; that Tidwell told her about the security deed to Rose Garden after her husband died and advised that she pay it, which she did with her own money; that after marrying H. L. Cobb they adopted a boy of two and a half years; that improvements made on the Rose Garden property after August, 1939, amounted to between $10,000 and $12,000, part of which was paid by her; that she was at Rose Garden one time in 1938, and three times before August 26, 1939; that she found out about the divorce when she was going with Cobb *Page 229 
in May, 1939; that on June 15, 1939, she moved into an apartment at 1324 Briarcliff Road, where she had a telephone and was listed as Mrs. J. W. Nelvind, posing as a married woman under a fictitious name; that H. L. Cobb was supposed to be Mr. Nelvind, but he was not living there; that Cobb visited her in that apartment, but did not sleep there; that she registered as Mrs. Nelvind because she knew she was going to live there when she got married, and Cobb told her to rent the apartment under that name; he did not want everybody to know where he was living.
George B. Tidwell testified at length, denying the material contentions of the plaintiff, especially as to any acts of coercion. He insisted that the plaintiff did not have any rights, except what was due her under the security deed and under the alimony agreement; that he, McNabb, and Cobb were representing the same interest as distinguished from the interest of the plaintiff; that he was not employed to see that the plaintiff got a fair, good, and favorable price in the sale of the Rose Garden property; that he was representing Cobb in drawing up the alimony settlement; that although he knew at all times that the plaintiff was acting in matters of great importance to her, he never at any time suggested that she obtain any independent legal advice.
Gordon J. McNabb, a witness for defendant, denied that he received the money when the Pelham Road property was sold, and testified that it was paid to the plaintiff; that she seemed anxious to convey the Rose Garden property to her husband; that $11,000 was handed to the plaintiff; that she bought a New York exchange check with it; that she and the witness made a trip to Florida, in order that she might purchase the Trianon Hotel; that she was not coerced into selling her property; that the reasonable value of the Rose Garden property in March, 1939, was $10,000; and that afterwards Cobb made improvements that cost $10,000.
Alan Kemper, the ordinary of Clayton County, testified that no one had tendered a will for probate, or applied for letters of administration of the estate of H. L. Cobb.
At the conclusion of the evidence the court directed a verdict in favor of the defendant. The plaintiff's motion for new trial was overruled, and she excepted. In a cross-bill of exceptions the defendant assigned error on the overruling of her demurrer. *Page 230 
1-4. The rulings announced in the first four headnotes, dealing with the demurrer to the petition, do not require elaboration.
5. The question now for decision is, considering the evidence most favorably to the plaintiff, did the court err in directing the verdict for the defendant? It is error for the judge to direct a verdict, except where there is no conflict in the evidence as to the material facts, and the evidence introduced together with all reasonable deductions or inferences therefrom demands a particular verdict. Code, § 110-104; Shaw v.Probasco, 139 Ga. 481 (77 S.E. 577). "A verdict should not be directed unless there is no issue of fact, or unless the proved facts, viewed from every possible legal point of view, can sustain no other finding than that directed." Davis v.Kirkland, 1 Ga. App. 5 (58 S.E. 209); Ayer v. FirstNational Bank Trust Co., 182 Ga. 765, 768 (187 S.E. 27). See Renitz v. Williamson, 149 Ga. 241 (4) (99 S.E. 869);Atwood v. Edenfield, 150 Ga. 198 (103 S.E. 170); Word v.Bowen, 181 Ga. 736 (3) (184 S.E. 303); Muscogee Motor Co.
v. Brown, 181 Ga. 797 (184 S.E. 317); Everett v. Miller,183 Ga. 343 (188 S.E. 342); Patterson v. Fountain,183 Ga. 676 (189 S.E. 4).
Did the evidence demand a verdict for the defendant on the ground of res judicata? A judgment, to be conclusive, must be a determination upon the merits of the case. Where a suit is not determined upon its merits, the judgment is not conclusive. Code, § 110-503. In Sparks v. Fort, 29 Ga. App. 531, 536
(116 S.E. 227), it was said: "`Sound sense, as well as the adjudications of the courts, lay down the rule that the rights of the parties must be actually considered and adjudicated before the former adjudication will bar the subsequent suit.' National Bank v.Southern Porcelain Co., 59 Ga. 157, 165; Linder v.Rowland, 122 Ga. 425 (2) (50 S.E. 124); Steed v. Savage,115 Ga. 97 (41 S.E. 272); Mitchell v. So. Bell Tel. Co.,150 Ga. 46 (102 S.E. 346); case note, 13 A.L.R. 1104, 1107."
After designated payments were made, which will be mentioned later, the judge entered an order dismissing the action filed on *Page 231 
September 24, 1941, because there were no issues to be determined between the parties. Where nothing is determined by a court, and the order of dismissal expressly states such fact, there is no judgment which can be res adjudicata in future litigation. However, if there had been a judgment in the former case, would it be res judicata under the facts of the instant case? InSlaughter v. Slaughter, 190 Ga. 229, 230 (9 S.E.2d 70, 129 A.L.R. 156), it was said: "The doctrine of res judicata is to be applied only when the cause of action is the same. Worth
v. Carmichael, 114 Ga. 699 (40 S.E. 797); Draper v.Medlock, 122 Ga. 234 (50 S.E. 113, 69 L.R.A. 483, 2 Ann. Cas. 650); Hill v. Cox, 151 Ga. 599 (107 S.E. 850)." In the case filed on September 24, 1941, the plaintiff was seeking to collect alimony under an agreement into which she contends she was induced to enter, while in the instant case she asserts her right to recover property wrongfully taken from her at a time before the alimony agreement; and the rights now asserted are wholly independent of the alimony agreement. The causes of action being wholly different, even if there had been a judgment in the earlier case, it would not constitute res judicata.
Another question is, did the evidence demand a verdict for the defendant on the ground of estoppel? An estoppel is an affirmative defense. In Seaboard Air-Line Railway Co. v.Holliday, 165 Ga. 200, 207 (140 S.E. 507), it was said: "The defendant having failed to show that it or any of its predecessors were ignorant of the true title, the burden being upon the defendant to establish the defense of estoppel, the court properly directed a verdict against the defendant upon its contention that the plaintiff was estopped." In Tune v.Beeland, 131 Ga. 528 (3) (62 S.E. 976), after stating facts which would constitute estoppel, it was said: "But where the facts relied on to establish the estoppel do not unequivocally show an estoppel in pais, the jury, and not the judge, should determine whether the facts constitute such an estoppel." SeeJackson v. Lipham, 158 Ga. 557 (3) (123 S.E. 887);Groover v. Simmons, 163 Ga. 778 (137 S.E. 237); Ware v.Mobley, 190 Ga. 249 (2) (9 S.E.2d 67). In Reese v.Spence, 188 Ga. 349 (4 S.E.2d 244), it was said: "Estoppel is negative, not creative. Parks v. Simpson, 124 Ga. 523,524 (52 S.E. 616). `Its whole scope is to protect one from loss which, but for the estoppel, he could not escape, and should be limited to saving the party asserting the *Page 232 
estoppel from loss.' Peacock v. Horne, 159 Ga. 707 (5) (126 S.E. 813)." See Fields v. Continental Insurance Co.,170 Ga. 28 (2) (152 S.E. 60); Bank of Lenox v. Webb NavalStores Co., 171 Ga. 464 (156 S.E. 30).
The defendant's contention is that because she paid $1812.50 and $567 the plaintiff may not now be heard to assert that she is entitled to recover the Rose Garden property. As to the $567, it appears from the evidence that such sum was paid by defendant with full knowledge of plaintiff's claims, while the present action was pending, thus making it a voluntary payment. Under the evidence the jury could have found that the reasonable market value of the Rose Garden property was $25,000. Should the plaintiff be denied to assert her rights to this property because the defendant paid the $1812.50, which, as indicated above, related to an entirely different transaction? The plaintiff in her petition states that she "offers in all things to do equity, and consents that any decree or judgment herein rendered may be molded in such manner as may be just and proper." A court of equity may mold its decree and require one seeking equity to do equity. Code, § 37-1203. "Equity seeks always to do complete justice; and hence, having the parties before the court rightfully, it will proceed to give full relief to all parties in reference to the subject-matter of the suit." § 37-105. Referring to this principle, in Pass v. Pass, 195 Ga. 155, 163
(23 S.E.2d 697), it was ruled that "the judge in seeking to do complete justice, which it was his duty to do under the Code, § 37-105 (Irons v. American National Bank, 178 Ga. 160 (5d), 172 S.E. 629), caused the interlocutory injunction to be conditioned upon the plaintiff paying such amount into court, which was done."
If the trial court should determine that upon the application of equitable principles to the facts the defendant was entitled to receive back the $1812.50 or the $567, she could be fully protected. In other words, upon a proper finding of facts a decree could be so framed as to fully protect the defendant in this respect, even though the verdict should be for the plaintiff as to recovery of the property. To hold otherwise would work a forfeiture, which equity seeks to avoid. In Johnson v. Ellis,172 Ga. 435 (158 S.E. 39), it was held in effect that one who, in ignorance of her rights under a will, had accepted a relatively trivial sum for the interest to *Page 233 
which she was actually entitled, may still be protected and the other parties restored to their former status. "Estoppels should be resorted to solely as a means of preventing injustice, and should not be permitted to defeat the administration of the law or to extend beyond the requirements of the transactions in which they originate. It is, moreover, recognized that the doctrine of estoppel when misapplied may be a most effective weapon for the accomplishment of injustice." 19 Am. Jur. 602, § 4.
Under the uncontradicted evidence, it is clear that the plaintiff made no demand upon the defendant with reference to payment of the $1812.50. What the plaintiff sought was simply to preserve the status, prevent a sale by the defendant to a bona fide purchaser, and establish the plaintiff's rights as against the property to alimony in a relatively trivial sum. The amount of $1812.50 represented notes due in future years, 1942, 1943, 1944, and 1945.
The petition filed on September 24, 1941, did not contain a prayer asking that the above notes be paid, and there is no evidence to show that the plaintiff intended that the defendant should pay them. The Code, § 38-116, declares: "In order for an equitable estoppel to arise, there must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence as to amount to constructive fraud, by which another has been misled to his injury." See Randolph v. Merchants Mechanics Banking c.Co., 181 Ga. 671, 676 (183 S.E. 801); Dingfelder v.Georgia Peach Growers Exchange, 182 Ga. 521 (2), 522 (186 S.E. 425); 19 Am. Jur. 653, § 51.
In Stonecipher v. Kear, 131 Ga. 688 (4) (63 S.E. 215, 127 Am. St. R. 248), it was held: "The owner of property is not estopped from setting up his title thereto by reason of acts and declarations on his part, alleged to have induced another to buy it as the property of a third person, unless it appear that the purchaser was ignorant of the falsity of such alleged inducements and really acted upon them and not upon his own knowledge or judgment." In the instant case there was no evidence that the defendant relied upon any representation or claim of the plaintiff. On this question the defendant (Cobb's widow) testified, that shortly after Cobb's death, she went to see Mr. Tidwell, the attorney who formerly represented her husband; that he told her of the security deed which he had withheld from record, and advised her to pay *Page 234 
the notes. The undisputed evidence further showed that on September 13, 1941, almost two weeks before the previous suit was filed, Mr. Tidwell obtained an agreement of the parties in Florida who held the notes maturing in the future, to accept payment by October 1, 1941, at a ten per cent. discount. Defendant thereupon made arrangements to mortgage property which she owned, got the money, turned it over to Tidwell, and he sent it to the owners of the notes. The money was sent on September 26, which would have been in time to reach the owners of the notes before October 1. While there was evidence as to conferences between the attorneys of the respective parties before this time, such testimony did not show that any demand had been made for payment of the notes, or that at the time the money was sent the defendant knew of the suit which had been filed two days earlier, and that the payment was because of that suit. The defendant, having failed to prove that she relied upon the suit in making the payment, was not entitled to estoppel upon this ground. Tinsley v. Rice, 105 Ga. 285, 290 (31 S.E. 174). Another question is, can it be contended that by agreeing, at the insistence and under the advice of Cobb's attorney, to enter into the alimony agreement and accept a deed conveying the Rose Garden property as security, the plaintiff was estopped to deny that Cobb then had title? Estoppel by deed applies to the maker of the deed. It does not ordinarily apply to the grantee. Code, § 29-111.
"It is a well-settled general rule that under ordinary circumstances, a grantee of property is not estopped to deny his grantor's title." 19 Am. Jur. 620, § 23. To the same effect seeGwinn v. Smith, 55 Ga. 145 (4); Phillips v. O'Neal,87 Ga. 727 (2) (13 S.E. 819); Bright v. Werden, 171 Ga. 660
(4-6) (156 S.E. 590); 21 C. J. 1069, § 28. When an estoppel by deed arises, it is limited to an action founded on the deed itself. In a collateral action, there is no estoppel. ColdwellCo. v. Cowart, 138 Ga. 233, 237 (75 S.E. 125); 21 C. J. 1091, § 73. The plaintiff in the instant case asserts no rights growing out of the unrecorded security deed. Conceding that she would be estopped in an action seeking to foreclose the security deed, she is not estopped in the present suit, arising out of a wholly different cause of action, which existed before the time she was induced to accept the terms of the alimony agreement and the security deed. *Page 235 
Did the judge properly direct the verdict for the defendant on the doctrine of election of remedies? In Harber v. Harber,158 Ga. 274 (123 S.E. 114, 33 A.L.R. 598), it was said: "A case of election only arises when a person is entitled to one of two benefits to each of which he has the legal title, but to enforce both would be unconscientious and inequitable to others having claims upon the same property or fund." It was further said: "The election between remedies exists when a party has several remedies for the same wrong, but pursues inconsistent remedies." It has been said that the rule as to election of remedies is a harsh one which should not be lightly enforced, that its scope should not be extended, and that for obvious reasons it has never been a favorite of equity. Friederichsenv. Renard, 247 U.S. 207 (38 Sup. Ct. 450, 62 L. ed. 1075). The rule implies knowledge or its equivalent on the part of the suitor of the facts material to his rights; and if a litigant commences an action or proceeding in ignorance of the substantial facts affecting his rights, he may when informed adopt a different remedy. Board of Education of Glynn County v. Day,128 Ga. 156 (6), 166 (57 S.E. 359); McNair v. Rabun,159 Ga. 401 (126 S.E. 9); Hartley v. Hartley, 173 Ga. 710
(161 S.E. 358); Land v. Hall, 46 Ga. App. 404 (3) (167 S.E. 711); 18 Am. Jur. 144, § 22. The evidence in this case authorized the inference that the plaintiff at the time of the filing of the first suit did not have actual or implied knowledge of the substantial facts affecting her rights, and hence could not and did not impart such knowledge to the attorneys by whom the suit was filed. The evidence would have authorized a finding that at the time the attorneys for plaintiff collected the $567 claimed in that suit, and paid the proceeds over to the plaintiff, she still did not have substantial knowledge of the nature and purport of that action, so as to make a conscious affirmance of it as a choice of remedies; these attorneys being different from those who filed the second suit, and the attorneys in neither case having any connection with the other litigation. Accordingly, although the collection of the $567 was made after the present suit was filed, the evidence did not demand a finding against the plaintiff under the doctrine of election of remedies.
The evidence disclosed that the defendant claimed under a deed of gift. Therefore, being a donee, she stands in the shoes of her *Page 236 
grantor. Code, § 37-108; Fletcher v. Fletcher, 158 Ga. 899
(7) (124 S.E. 722).
Under the evidence, the jury would have been authorized to find that the plaintiff was the victim in a scheme whereby her then husband by duress and fraudulent means obtained title to his wife's property. In all the circumstances a different ruling is not required because the evidence showed that on September 24, 1941, the plaintiff filed a petition (nineteen days before the instant suit) seeking to have a security deed held by her declared a prior lien to the deed held by the defendant. Some of the circumstances referred to are (1) that the suit was filed by attorneys in Atlanta, who knew nothing about the early history of the case, having been employed by correspondence with the plaintiff, who was ill in Florida, "in no mental condition to protect her interest in a business transaction;" (2) evidence showing that a $2000 payment, less discount, on the Florida hotel property, was a voluntary payment of notes signed jointly by the plaintiff and the defendant's husband, and that the notes were not due; (3) failure of the defendant to prove that the above amount was paid as a result of the previous suit; (4) evidence that the payment of $567 to the plaintiff, for which a receipt had been given before the institution of any suit, was not made until after the filing of the present suit with full knowledge of her contentions. In all the circumstances, the evidence did not demand a finding for the defendant on the theory of res judicata, estoppel, or election of remedies, but would have authorized a finding in favor of the plaintiff. The judge erred in directing the verdict.
Judgment reversed on the main bill of exceptions, andaffirmed on the cross-bill. All the Justices concur. *Page 237